IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2001

## STATE OF TENNESSEE v. JOSEPH J. LEVITT, JR.

**Direct Appeal from the Criminal Court for Knox County**
**No. 66082     E. Shayne Sexton, Judge**

**No. E2000-03051-CCA-R3-CD**
**December 18, 2001**

The defendant drove up behind a vehicle which had halted because of a driver's license roadblock near Knoxville. He then proceeded onto the right shoulder to get around that vehicle and was stopped by the Tennessee Highway Patrol officer conducting the roadblock. What next occurred was highly disputed, but the events culminated with the defendant's being sprayed with Freeze, some of which was deflected back onto the officer, partially incapacitating him also. The defendant was charged with resisting arrest, reckless driving, and failure to carry and display a driver's license on demand. The reckless driving charge was *nolle prosequi* and, following a jury trial, the defendant was found not guilty of resisting arrest but was convicted of the driver's license charge, sentenced to ten days confinement, which was suspended, and ordered to pay a $50 fine and court costs. He timely appealed the conviction, arguing that the roadblock was unconstitutional. Based upon our review, we conclude that the roadblock was unconstitutional and that the officers lacked probable cause to stop the defendant's vehicle. Accordingly, we reverse the conviction and dismiss the charge.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**
**and Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

James A. H. Bell, Knoxville, Tennessee, for the appellant, Joseph J. Levitt, Jr.

Paul G. Summers, Attorney General and Reporter; Peter M. Coughlan, Assistant Attorney General; and Eric D. Christiansen, District Attorney General Pro Tem, for the appellee, State of Tennessee.

**OPINION**

Following a jury trial, the defendant was found not guilty of resisting arrest but guilty of failure to carry and display his driver's license on demand, in violation of Tennessee Code Annotated Section 55-50-351, a Class C misdemeanor. The trial court sentenced the defendant to ten days in

the county jail, suspended upon payment of a $50 fine and all court costs. Following the denial of his motion for a new trial, the defendant filed a timely notice of appeal to this court, raising two issues, which he states in his brief as follows:

> I. The Trial Court erred in determining that the roadblock operated by members of the Tennessee Highway Patrol was constitutionally permissible and denying the Appellant's Motion to Suppress all evidence obtained as a result of this roadblock.

> II. The evidence presented at trial was insufficient to prove beyond a reasonable doubt that the Appellant was operating a motor vehicle in violation of T.C.A. § 55-50-351, requiring that an individual carry a valid drivers [sic] license and display same when asked to by law enforcement officers.

Although the evidence presented was sufficient to sustain the conviction, we conclude that the trial court erred in denying the defendant's motion to suppress evidence relating to the charge of failure to carry and display his license on demand, reverse the conviction, and dismiss the charge.

## FACTS

On Saturday, April 5, 1997, at the beginning of their shifts, Troopers Frank Shearl and Stephen Parsley of the Tennessee Highway Patrol approached their supervisor, Sergeant Dennis Murray, at the Rocky Top gas station in Knoxville, informed him that they wanted to conduct a "traffic enforcement" roadblock together that day, pursuant to General Order 410,[1] and received his permission to establish a driver's license checkpoint underneath the South Knoxville Bridge on Riverside Drive in Knoxville. The spot was a "preapproved" roadblock site, where many roadblocks had been conducted in the past. The road was two-lane, approximately twenty to twenty-two feet wide, and ran east to west underneath the bridge. Paved shoulders that were at least ten feet wide made it possible for the troopers to pull vehicles to the side of the road in safety. Approximately 100 to 200 feet east of the site, and 400 to 500 feet west, sharp curves in the road hid the roadblock from approaching traffic. The troopers acknowledged that they had no traffic statistics or data that indicated the need for a traffic enforcement roadblock at that site. Instead, the location was chosen because it was a convenient site for the officers to conduct a roadblock.[2]

The roadblock was begun at 4:15 p.m., and operated until approximately 6:30 p.m. Trooper Shearl, as the officer with the most seniority, was in charge. Trooper Parsley testified at the suppression hearing that their "predetermined" plan was to stop every vehicle that came through the

---

[1] Tennessee Department of Safety General Order 410, governing the operation and establishment of traffic enforcement roadblocks, requires the presence of only two officers. Sobriety roadblocks, by contrast, require six officers.

[2] It was possible for a roadblock at that location to be conducted by only two officers. The site was also centrally located, making it possible for the troopers to respond fairly quickly to emergency calls throughout the county.

roadblock, unless the conditions became too hazardous to do so. Both troopers were in uniform, and the blue lights on their patrol cars, which were parked on the westbound shoulder of the road, were activated. However, no advance publicity of the checkpoint was given, no traffic cones were set up to direct motorists through the roadblock, and there were no signs to warn approaching drivers of the roadblock.

The checkpoint had been in operation for approximately an hour and a half to two hours when the sixty-five-year-old defendant, Knoxville lawyer Joseph J. Levitt, Jr., approached it in the eastbound lane. The defendant, who had been mowing grass at one of his rental properties, was driving a 1977 Chevrolet van and towing a medium-sized trailer carrying lawn equipment. Trooper Shearl was in his patrol car, parked on the westbound shoulder of the road, writing a ticket to a violator who was parked on the eastbound shoulder. Immediately in front of the defendant, in the eastbound lane, Trooper Parsley had stopped a small, older model Chevrolet Blazer sport utility vehicle. The Blazer was towing a ten-foot-wide boat trailer carrying a twenty-four-foot- long pontoon boat that had a mooring cover over it. Trooper Parsley was standing beside the driver's door, checking the license of the driver of the Blazer. There were no vehicles stopped in the westbound lane.

At the suppression hearing, Trooper Parsley testified that he was talking to the driver of the Blazer when he "heard gravel being kicked up," and looked up to see the defendant's orange and white van coming around on the right, traveling on the gravel portion of the shoulder. He said that he saw the van veer, and almost strike a parked vehicle ahead of it on the shoulder, before reentering the paved shoulder and then the traffic lane. Later in his testimony, he said that the defendant came within "two to three feet" of the parked vehicle, before moving back over into the eastbound lane. He estimated the speed of the defendant's van as between twenty-five and thirty miles per hour, and said that, although that was within the speed limit on Riverside Drive, the manner in which the defendant was driving "was unsafe for the conditions at the time we were there at the roadblock."

Trooper Parsley testified that when he yelled "stop," the defendant stopped with his vehicle at a slight angle, with the "left front portion" of his bumper "a few inches" over the center double yellow line. He said that he handed back the driver's license of the driver of the Blazer, walked up to the defendant, told him that he could not "drive around the shoulder like that," and asked to see his license. According to Trooper Parsley, the defendant, who appeared "very irate," told him that he did not have to stop, and that Trooper Parsley was to call him "sir."[3]

---

[3]The State did not question Trooper Parsley about what occurred following the stop. At trial, however, he testified that after he "calmly" approached the defendant's van and told him that he could not "go around traffic like that," the defendant answered, "You-all shouldn't have the damn road blocked," and said that Trooper Parsley was to address him as "sir." Trooper Parsley said that he responded that he did not have to call the defendant sir, and that he needed to see his driver's license. According to Trooper Parsley, he asked three times to see the defendant's license, saying, "I need to see your driver's license. I need to see your driver's license. I need to see your driver's license[,]" but all three times the defendant refused, using the curse words "damn" and "damnit." Trooper Parsley said that he then opened the door to the defendant's van, and told him to step out and show his identification. Instead of complying, the

(continued...)

On cross-examination, Trooper Parsley acknowledged that from his position beside the driver's door of the Blazer, he could not see traffic approaching behind the large pontoon boat. He admitted that he had not stepped away from the Blazer to signal approaching traffic to stop. He also acknowledged that they had no traffic cones set up at the roadblock, that he was not wearing a reflective safety vest, and that he was not using a flashlight. He pointed out, however, that it was daylight at the time, which made reflective vests and flashlights unnecessary. When asked whether there was anything to distinguish him "from checking out a wreck," he answered, "In my perception, no." He also verified that during the preliminary hearing, he had acknowledged that whether he had been conducting a roadblock or investigating a wreck probably would have depended on the perception of the individual driver.

The defendant testified that the site appeared to him to be the scene of an accident. As he rounded the sharp curve leading to the bridge, he saw the flashing lights of the patrol cars on the shoulder on the left side of the road and the back end of the boat trailer. However, he did not see Trooper Parsley standing in the road beside the Blazer, or anything else that would have indicated that it was a roadblock, rather than an accident. He testified that he drove slowly toward the scene, looking to see if the way was clear for him to drive around. He explained that he was familiar with the road, and knew that there was another sharp curve only a short distance ahead, just beyond the bridge. He therefore decided to pass the boat and Blazer on the right, driving around on the paved shoulder of the roadway.

The defendant said that he was on the lookout for broken glass in the road, and was "just creeping"[4] as he drove past the boat and Blazer. After his trailer had cleared the Blazer, he began easing back over into the lane. When he was back in the lane, he heard someone yell, "Hey, asshole." When he heard it again, he leaned out of the window and saw Trooper Parsley coming toward him. The defendant said that he asked, "Officer, is there something wrong?" and that Trooper Parsley answered, "Yes, asshole, stop." The defendant testified that he told the officer, "I don't believe you should talk to citizens like that. You can call me sir." The defendant described what next ensued:

> This officer here, Parsley, came up to my car, and by then–I had my
> arm on the window, and I pushed my gear shift into park, and I asked
> him, I said – again, if there was something wrong, and he called me

---

[3](...continued)

defendant kicked him in the shin. In response, Trooper Parsley grabbed the defendant's left arm and pulled. When he "yanked," the defendant's foot came off the brake, and the van started to roll. Trooper Parsley then sprayed the defendant in the face with mace. By that time, Trooper Shearl had come up behind Parsley, and he also sprayed the defendant in the face with mace. He testified that he and Trooper Shearl "got [the defendant] out" of the van, and "approximately three feet from his van, he was laid on the concrete." Trooper Parsley said that he searched the defendant's wallet after he had been placed under arrest and found an expired license. He later ran the defendant's license number through dispatch, and learned that he possessed a current license.

[4]The State asserts in its brief that the defendant testified that "he thought he had come upon the scene of an accident, yet he went around the scene at or near the speed limit."

asshole again, said he didn't have to call me sir, and grabbed my arm and then just boom, boom, boom. Somebody grabbed my arm. I was sprayed in the face. The door was jerked open, and I was pulled out and my arm, still laying up there on the thing, and it pulled the–the vehicle out of park. And pulled me out on the ground and sprayed me either–either once in the van and once coming out the door or twice in the van. I'm really not sure.

Paul Michael McLain, the driver of the Chevrolet Blazer, testified that earlier that afternoon he and his wife had driven to the boat ramp at the South Knoxville Bridge so that he could help his friend, Randy Reynolds, tow his boat home. On their way to meet Reynolds, they drove through the roadblock without being stopped. He said they had not realized that it was a roadblock, and had thought they were approaching a wreck. He saw the troopers, but they were at another vehicle, and there were no signs to indicate that they were conducting a roadblock.

On the return trip with the boat, McLain was driving Reynolds' Blazer. With him in the Blazer were Reynolds, Reynolds' wife Rita, and another woman named Sharon Monday. This time, driving in the eastbound lane, he was stopped by an officer, whom he later identified as Trooper Parsley, who asked to see his driver's license and whether he had been drinking. McLain said that he told the trooper that he had not had anything but iced tea, and they were joking about that as the defendant came driving around the Blazer on the right shoulder. He said that the defendant was driving "very slow," at "a speed of five miles an hour or less," did not veer or swerve, and was not kicking up a cloud of dust, rocks, or gravel.

McLain said that Trooper Parsley yelled "Hey" or "some words" at the defendant and that, although the defendant did not stop immediately,[5] he eventually came to a stop with the end of his trailer approximately thirty feet in front of the Blazer. Trooper Parsley left the Blazer and went up to the door of the defendant's van. McLain could not hear any of the conversation, but saw Trooper Parsley standing at the door of the van for ten or fifteen seconds. He then saw the other trooper start across the road toward the van. Halfway across the road, this second trooper took something out of his belt and started shaking it. When the second trooper reached the van, he sprayed something in the driver's window. McLain testified that the driver's door was closed at the time. Together, the two troopers physically removed the defendant from his van. The second trooper then jumped in the van to stop it from rolling away, and Trooper Parsley began leading the defendant across the street. Halfway across, he stuck his foot out, tripping the defendant, who fell to his knees and lost his eyeglasses in the process. As the defendant groped for his glasses with his free hand, Trooper Parsley "took his foot and, like a sweeping kick, kicked his glasses out of the way." After the defendant was handcuffed, the officers motioned for McLain to drive on.

---

[5]McLain implied that he thought Trooper Parsley's initial yell might not have been heard by the defendant because his window was rolled up.

On cross-examination, McLain testified that he could not recall seeing the defendant kick Trooper Parsley, and that he could not say who had opened the van door. When asked if he had seen the defendant kick at Trooper Parsley, he answered, "The door come open, the officers was [sic] removing him from the vehicle, I seen legs at that time, you know. Whether they were in a kicking motion, I cannot tell you that, sir. I don't know." McLain admitted that he had not reported Trooper Parsley's treatment of the defendant to any authorities. He said that he had contacted the defendant after Reynolds read an article in the newspaper about the incident, and recognized it as the same one they had witnessed.

Randy Reynolds, the owner of the Blazer, testified that he was sitting in the front passenger seat when he saw the defendant drive past the Blazer on the shoulder, traveling very slowly, at "three, four, five mile an hour, somewhere around there." He described what occurred:

> Well, I noticed it [the defendant's van] when he got about to the mirror, and the officer hollered–when he got about to the front of the Blazer, the officer hollered, "Stop," I believe that's what it was, and so he kind of pulled on up a little, maybe five, ten foot, and he was just barely rolling and one–one officer runs over and grabs the door, and the other one runs and grabs him and jerks him out, and one throws it in park.

Reynolds said that he did not see any signs announcing that the troopers were conducting a roadblock. He had assumed that it was a roadblock, however, because he had had the opportunity to watch the troopers for ten or fifteen minutes as he loaded his boat onto the trailer.

On cross-examination, he testified that the defendant's van slowed down, but never came to a complete stop. The rear of the defendant's trailer, he said, was about ten feet in front of his Blazer when the first trooper started toward the van. That trooper said something to the defendant, which Reynolds could not hear. He then opened the door of the van and grabbed the defendant, while the second trooper put the van in park. After the troopers had pulled the defendant out of the van, the first trooper, who had the defendant's arm in a twisting hold, put his foot behind the defendant's legs, and "took him down" to the ground.

At the conclusion of the hearing, the trial court issued an oral ruling denying the motion to suppress. In its ruling, the court indicated that it was finding that the constitutionality of the roadblock was irrelevant because the defendant had driven around the checkpoint:

> We're not talking about someone who did not comply with a willful–I don't see the roadblock as the issue here. I don't. I think that [the defendant] candidly said that he thought it was a wreck, and I'll take that–I'll take that as money in the bank. The question becomes after–I don't think he did anything improper. I don't think he did anything improper by going by, but the question is, once the officer

-6-

says "Stop," what happens? I think the officer at that point had a right to say "Stop." Up until then, I don't see anything wrong with this process.

However, as the following exchange makes clear, the court also gave at least some indication that it was finding the roadblock constitutional, based on the fact that it did not substantially deviate from the procedures established in Department of Safety General Order 410:

> MR. BELL: But, Your Honor, he had him stopped, not because of a wreck but because the officer believed he was conducting a roadblock. That's what–
>
> THE COURT: You see, I don't–well, then we go back to is this a lawful roadblock? I believe that under General Order 410, I don't think that what happened deviates substantially from–what happened factually in this case, deviates substantially from 410. Now, I think that Downey has cleaned up a lot of what 410 did, but that's the problem with running these cases three years down the line.
>
> I'll tell you, gentlemen–I mean, I am–this is somewhat probably unusual coming from a court, but I don't see the problems leading up to the stop. I see terrible problems after it happened. I mean–

When asked to clarify its ruling regarding the constitutionality of the stop, the court explained that it did not find the procedures for constitutionally reasonable sobriety checkpoints, adopted by our supreme court in State v. Downey, 945 S.W.2d 102 (Tenn. 1997), applicable to the case:

> Your ruling is as follows. As to Downey, I find that it does not apply. As a matter of law, I have considered the changes that were made to General Order 410 based on the Downey case. I think I have run that through my mind. Standing, I don't think is an issue in this case. I think that [the defendant] availed himself to what is a right of his, which is to proceed around. I don't think it was a necessarily safe action. I don't think that everyone would do that, but I believe that he was within his power to do that, but I also think that the officer had, within his duty, the option to ask [the defendant] to stop, and I believe that occurred. I think the officer acted lawfully and [the defendant] acted lawfully, and so I find that there was no unlawful halt, there was no unlawful stop. I don't find the roadblock procedures persuasive in any way, and I think that the case will go forward like that.

The court went on to find that the evidence did not support the reckless driving charge, and that the defendant's "action did not, in and of themselves, [sic] constitute an act that might by itself be sufficient to stop the car." When asked on what basis it was finding that the trooper had lawfully stopped the defendant, the trial court stated that it was based on:

> The statute of when blue lights are running, the law enforcement officer is running whatever process on the road, whether he's working a wreck, whether he's running a roadblock, whatever it is, at that particular time, the road was quarantined off or it was at least being supervised by the Tennessee Highway Patrol, and [the defendant] didn't know why. He was acting on his own. That's fine. The officer had different intentions, but his intentions were well founded. He didn't know if [the defendant] was driving around to avoid that or to drive around to avoid a wreck, to avoid whatever, just didn't know if he was getting around the edge.
>
> My ruling is that nothing improper on either side occurred. But I think the officer had a right to stop him, and [the defendant] did what law enforcement–or what law-abiding citizens would do, which is stop. At that point it's–that's really what the jury is going to decide, but I think I have–

Based on the trial court's findings, defense counsel moved to amend the motion to suppress to include an argument that the trooper had no reasonable suspicion to justify a <u>Terry</u>-type[6] stop of the defendant. In response, the trial court first repeated that the trooper lawfully stopped the defendant pursuant to his authority to direct and control traffic on public roads, stating:

> Well, reasonable suspicion is what the buzzword is, but this is one the State–and I think it's a proper contention when a law enforcement officer has given an order for a motorist to stop, they are to stop. We're not talking about a search. We're not talking about evidence that was gained after. We're talking about a terrible thing that occurred after the stop.

However, the court later went on to indicate that it was finding that the trooper had reasonable suspicion for the stop, stating that the trooper was not mistaken in the stop, and that it occurred because "[i]n his mind he thought you were going around his roadblock." The defendant then proceeded to trial on the two remaining charges of the indictment.

## ANALYSIS

---

[6] <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

## I. Trial Court's Denial of Motion to Suppress

In challenging the trial court's denial of his motion to suppress, the defendant argues, first, that drivers' license checkpoints are *per se* unconstitutional, and second, that even if not *per se* unconstitutional, the checkpoint at issue in this case failed to satisfy the guidelines established in State v. Downey, 945 S.W.2d 102 (Tenn. 1997), and State v. Hicks, 55 S.W.3d 515 (Tenn. 2001), for a constitutional suspicionless stop.[7] The State responds by arguing that the constitutionality of the roadblock is irrelevant. The State contends that the defendant was stopped for the reckless manner in which he drove around the roadblock, and that the trooper's request for his license was a permissible part of a valid investigatory stop.

### A. Standard of Review

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light of the entire record[,]" an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

### B. Denial of Motion to Suppress

In order to set the framework for our review, and because the defendant's brief focuses on this topic, we will begin our analysis by examining the constitutionality of the roadblock at issue in

---

[7]The Hicks opinion was released after the briefs were filed in this case. Pursuant to Rule 27(d) of the Tennessee Rules of Appellate Procedure, the defendant submitted the case as supplemental authority for his argument.

this case. Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. at 865 (citations omitted). The stop of an automobile, even for the short duration involved in a driver's checkpoint, constitutes a seizure under both the United States and Tennessee Constitutions. See Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996); Michigan v. Sitz, 496 U.S. 444, 449-51, 110 S. Ct. 2481, 2485, 110 L. Ed. 2d 412 (1990); Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660 (1979); State v. Downey, 945 S.W.2d 102, 107 (Tenn. 1997). Thus, to be considered reasonable, the warrantless stop of an automobile must fall under one of the exceptions to the warrant requirement. These exceptions include investigative stops based on reasonable suspicion of wrongdoing on the part of the occupants of the vehicle, see Whren, 517 U.S. at 810, 116 S. Ct. at 1769; Prouse, 440 U.S. at 655, 99 S. Ct. at 1391; State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997), and roadblocks that are conducted "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, 443 U.S. 47, 51, 99 S. Ct. 2637, 2640, 61 L. Ed. 2d 357 (1979). Under the latter exception, the United States Supreme Court, balancing the public interest in preventing drunk driving against the Fourth Amendment interest of the individual, has held that a roadblock designed to check for intoxicated drivers is not violative of the Fourth Amendment to the United States Constitution. Sitz, 496 U.S. at 453, 110 S. Ct. at 2485.

In State v. Downey, 945 S.W.2d 102 (Tenn. 1997), our supreme court adopted the balancing analysis used in Sitz to determine whether sobriety checkpoints violate Article I, Section 7 of the Tennessee Constitution. Id. at 110. Under this analysis, which weighs "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty,'" id. at 107 (quoting Brown, 443 U.S. at 50-51, 99 S. Ct. at 2640), the court concluded that a sobriety checkpoint, because of the compelling public interest in preventing drunk driving, can be a reasonable seizure under the Tennessee Constitution "provided it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene." Id. at 104. Because the evidence in Downey revealed that the decision to operate the checkpoint was made by an officer in the field, who acted without any supervisory or administrative oversight of his actions, the court found that the roadblock was unconstitutional under Article I, Section 7 of the Tennessee Constitution. Id. at 110-11.

More recently, in State v. Hicks, 55 S.W.3d 515 (Tenn. 2001), our supreme court addressed the constitutionality of drivers' license roadblocks under Article I, Section 7 of the Tennessee Constitution. Id. at 519. The court explained that the balancing test used in Downey is to be applied

not just to sobriety checkpoints, but in "all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution." Id. at 524. It next determined that, under the Downey test, "a roadblock will necessarily fail constitutional examination if it lacks a sufficiently compelling state interest." Id. at 527. The court then considered whether there is a sufficiently compelling state interest in roadblocks established solely to check drivers' licenses. After examining the State's assertion that drivers' license roadblocks are necessary to ensure highway safety by detecting and deterring unlicensed drivers, it concluded that "no evidence in the record establishes this fact, or even if true, establishes that this interest is sufficiently compelling to justify suspicionless stops." Id. The court wrote:

> Because the exceptions to the warrant requirement "are jealously and carefully drawn," the State must show that "the exigencies of the situation made the search [or seizure] *imperative*." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (emphasis added and internal quotations omitted). Therefore, as required in Downey, the State must show that drivers not possessing a license are unable to safely operate motor vehicles on the roads and highways of this state; that an unlicensed driver invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. Only when this showing is made may courts find that the State has a sufficiently compelling interest to justify maintaining drivers' license roadblocks.

Id.

In a separate concurring opinion, Chief Justice Anderson, joined by Justice Birch, concluded that drivers' license roadblocks are *per se* unconstitutional under Article I, Section 7 of the Tennessee Constitution because a sufficiently compelling state interest in drivers' license roadblocks can never be shown. Id. at 539. Distinguishing drivers' license roadblocks from sobriety roadblocks, Justice Anderson wrote: "In my view, there is no basis upon which to reasonably conclude that a motorist who is not in possession of a valid drivers' license *necessarily* poses an immediate danger of death or serious bodily injury great enough to warrant the suspicionless stop of *all* drivers at a checkpoint." Id. at 540 (emphasis in original).

In light of Hicks, we conclude that the drivers' license checkpoint in this case was an unreasonable seizure, violative of Article I, Section 7 of the Tennessee Constitution. First and foremost, the required showing of a compelling state interest was not made. "Only when the State makes the required showing, as it has previously done with sobriety checkpoints, may courts accept the presence of the compelling interest and proceed to further analyze the roadblock under this decision and Downey." Id. at 528.

-11-

However, even had the State established a compelling interest, we would still have no hesitation in determining that the roadblock here failed to pass constitutional muster, based on its failure to be established and operated in a manner that minimized its intrusiveness on individual freedom. The Hicks court made it clear that drivers' license roadblocks are subject to the same requirements for constitutional reasonableness as sobriety roadblocks. Id. at 537 n.13. According to the court:

> [T]he most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field. Two facts are critical to finding that the officers' discretion on the scene was properly limited: (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock. In all cases, therefore, the State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation. To be clear, these factors are so essential to a reasonable roadblock that the absence of either of them will necessarily result in the invalidation of the stops.

Id. at 533 (citation omitted).

The roadblock here did not meet these minimal standards for constitutionality. There was no meaningful prior administrative authorization or approval for the establishment of the roadblock at the Riverside Drive location on the afternoon of April 5, 1997. Troopers Parsley and Shearl formulated the plan for the roadblock together, and had a location picked out, before approaching Sergeant Murray at the service station to obtain his approval. Although Sergeant Murray's permission may have technically complied with the Downey requirement that the party responsible for establishing the roadblock be different from the party responsible for approving it, we cannot conclude that mere acquiescence to an already formulated plan satisfies the reasonableness requirement. It is also clear that the officers in the field, who were totally unsupervised at the scene, chose the time of the roadblock, the procedures to be employed, and which vehicles were to be stopped. Further evidence supporting the unreasonableness of the roadblock includes the lack of advance publicity, the failure to have traffic cones or warning signs in place, and testimony indicating that Trooper Parsley used the roadblock as a subterfuge to question at least one driver about his drinking. See generally, id. at 534-38.

Had the defendant stayed in his lane, to be stopped after Trooper Parsley concluded his encounter with McLain, our inquiry would be ended, since there would be no doubt that he would be entitled to the suppression of evidence obtained as the result of a seizure at an unlawful roadblock. See State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). However, the defendant drove

onto the paved shoulder to pass on the right the vehicle immediately in front of him before pulling back into the lane. Therefore, we must next consider whether the trial court erred in finding that Trooper Parsley lawfully stopped the defendant after he had passed on the right the Blazer and its trailer which was stopped in his lane.[8]

In Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed.2d 889, the United States Supreme Court held that a law enforcement officer may conduct a brief, investigatory stop of an individual if the officer has a reasonable suspicion, based on specific and articulable facts, of criminal activity on the part of the individual. Under the Terry rationale, an officer may stop and detain a vehicle based on the reasonable suspicion that one of its occupants is either engaged in, or about to be engaged in, criminal activity. Ornelas v. United States, 517 U.S. 690, 693, 116 S. Ct. 1657, 1662, 134 L. Ed. 2d 911 (1996); State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998); Vineyard, 958 S.W.2d at 734. Reasonable suspicion is an objective standard, and must be determined from the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981); Ornelas, 517 U.S. at 696, 116 S. Ct. at 1661-62. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417-18, 101 S. Ct. at 695. Reasonable suspicion will be found to exist only when "the events which occurred leading up to the stop" would cause an "objectively reasonable police officer" to suspect criminal activity on the part of the individual stopped. Ornelas, 517 U.S. at 696, 116 S. Ct. at 1661-62.

The State argues that the defendant's reckless manner of driving around the Blazer provided Trooper Parsley with "more than reasonable suspicion" for the stop. We agree that the observation of a traffic violation, such as reckless driving, would have given Trooper Parsley not only reasonable suspicion, but probable cause, to stop the defendant. See Whren v. United States, 517 U.S. 806, 817, 116 S. Ct. 1769, 1776, 135 L. Ed. 2d 89 (1996) (citations omitted) (noting that traffic violations provide probable cause for a stop). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810, 116 S. Ct. at 1772 (citations omitted). The descriptions were vastly differing as to the manner in which the defendant passed to the right the pontoon boat, pulled by the Blazer, which were stopped in his lane. The photographs of the area show that the shoulder adjacent to the spot where the Blazer was stopped is paved and somewhat wider than the lane itself. Portions of the surface of the paved right shoulder appear to have dirt and loose gravel on them. Paul Michael McLain, the driver of the Blazer, testified at the trial that, as the defendant's van came abreast of his vehicle, the van was proceeding "[v]ery slow. Very slowly, less than five miles an hour." He said that the van then stopped about thirty feet in front of his vehicle. Additionally, he had testified at the motion to suppress that the defendant's vehicle was neither swerving nor veering and agreed that it was not "kicking up a cloud of dust and rocks and gravel." During the motion to suppress, he also

[8]We note, however, that in a recent unpublished opinion, another panel of this court concluded that a defendant who accelerated past a trooper conducting a roadblock, before finally halting in the center of the road, had been stopped at the roadblock. See State v. Joe W. Steward, No. M1999-01284-CCA-R3-CD, 2000 WL 1246436, at *1-2 (Tenn. Crim. App. Aug. 18, 2000), perm. to appeal granted (Tenn. Oct. 8, 2001).

said that he did not see the defendant's van come close to hitting another car. Randy Reynolds, sitting in the right front seat of the Blazer, agreed that the van was going "[f]our or five mile[s] an hour" when he first saw it, and that he did not notice if it was kicking up "dust and rocks." At the motion to suppress, he had also testified that, as far as he knew, the defendant's van had not come close to striking either the Blazer or another vehicle.

In contrast to the testimony of the driver and passenger of the Blazer, Trooper Parsley testified at the motion to suppress that he heard "gravel being kicked up," and, looking up, saw the defendant's van coming around the right side of the Blazer, almost striking a vehicle parked on the shoulder in front of the Blazer, and then reentering the lane of traffic in front of the Blazer. He estimated the speed of the van was "25 to 30 miles per hour, not above the speed limit, but around the speed limit or right at it." He said that the van was being operated in a manner which was "unsafe for the conditions at the time we were there at the roadblock."

After hearing the testimony at the motion to suppress, the trial court concluded, apparently both factually and legally, that the State had failed to make a case against the defendant for reckless driving. Resolving the conflicting testimony as to the defendant's speed and whether he nearly struck another vehicle in passing the Blazer on the right, the trial court, as we understand its findings, rejected the officer's testimony and accredited the defense proof that the act of passing the Blazer, and the manner in which the defendant did so, did not constitute reckless driving. Applying the appropriate standard of review, we conclude that since, in this regard, "the greater weight of the evidence supports the trial court's findings, those findings shall be upheld." Odom, 928 S.W.2d at 23. Thus, we conclude that the trial court did not err in determining that the defendant's actions in driving onto the shoulder to pass the Blazer on the right did not provide either probable cause or reasonable suspicion for stopping his vehicle.

In addition to arguing that the defendant's manner of driving was reckless, the prosecutor argued at the suppression hearing that in passing the Blazer on the shoulder, the defendant violated the statute requiring motorists to drive within the clearly marked lanes of traffic. This statute provides, in pertinent part:

> **Driving on roadways laned for traffic.–**Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]

Tenn. Code Ann. § 55-8-123(1) (1998).

The prosecutor also referred the trial court to the statute which permits passing on the right only under limited conditions:

> **When overtaking on the right is permitted.**–(a) The driver of a vehicle may overtake and pass upon the right of another vehicle only under the following conditions:
>
>> (1) When the vehicle overtaken is making or about to make a left turn;
>>
>> (2) Upon a street or highway with unobstructed pavement not occupied by parked vehicles of sufficient width for two (2) or more lines of moving vehicles in each direction; and
>>
>> (3) Upon a one-way street, or upon any roadway on which traffic is restricted to one (1) direction of movement, where the roadway is free from obstructions and of sufficient width for two (2) or more lines of moving vehicles.
>
> (b) The driver of a vehicle may overtake and pass another vehicle upon the right only under such conditions permitting such movement in safety. In no event shall such movement be made by driving off the pavement or main-traveled portion of the roadway.

Tenn. Code Ann. § 55-8-118 (1998). The defendant responded by advising the trial court that the statute had been interpreted to allow travel on the shoulder.[9]

The trial court found that the defendant did not violate any traffic laws by passing on the right. We agree. The defendant did not travel for any substantial distance or period of time outside his lane of traffic, and quite obviously believed that it would be safer to pass on the right than on the left, given the sharp curve in the road ahead. He testified that he checked to see if the way was clear, and proceeded slowly and cautiously around the stopped vehicle and boat. The paved shoulder, which was at least ten feet wide, provided ample room for him to maneuver, and there were no parked vehicles impeding his path.[10] The defendant was immediately behind the Blazer and boat, and nothing in the evidence indicates that there were any other vehicles stopped behind him. Thus,

---

[9] In Ludwick v. Doe, 914 S.W.2d 522 (Tenn. Ct. App. 1995), the Court of Appeals interpreted the words "street" or "highway" to include "the part designated for vehicular travel by the public, any paved shoulder, any unpaved shoulder, and any remaining part of the right of way," concluding that this statute was not violated by a motorist's driving onto the paved shoulder to pass on the right a vehicle which was stopped, waiting to make a left turn. Id. at 525.

[10] Trooper Parsley testified that, as the defendant had entered the right shoulder, he almost struck a vehicle parked on the shoulder and in front of the Blazer. However, the occupants of the Blazer did not observe the defendant's nearly striking this parked vehicle, and the trial court accredited their testimony in this regard.

-15-

this was not the case of a motorist attempting to get around backed up traffic by traveling on the shoulder, while the rest of the motorists waited in the lane. Instead, the defendant utilized the shoulder only for the length of time necessary to get around what he believed to be a vehicle that had been involved in an accident. Accordingly, we conclude that the defendant did not violate this statute by driving onto the shoulder to pass on the right the vehicle stopped in his lane of traffic.

Next, we consider whether the defendant's action in bypassing the roadblock was sufficient to create reasonable suspicion for the stop. In State v. Binion, 900 S.W.2d 702, 705 (Tenn. Crim. App. 1994), this court concluded that a motorist's attempts to avoid a roadblock may give rise to a reasonable suspicion of criminal activity.[11] We recognized, however, that a determination of whether reasonable suspicion exists is necessarily fact-specific, requiring a case-by-case analysis:

> Whether reasonable suspicion exists must be determined from the totality of circumstances on a case by case basis. Among the factors to be considered is *whether objective evidence indicates that the motorist was attempting to evade arrest or detection.* Such evidence may include the distance the motorist was from the roadblock when the turn-off or U-turn was made, *whether the motorist was able to see the roadblock before the motorist took evasive action*, and the manner in which the motorist operates his or her automobile in making the evasive action. Other factors to be considered are the arresting officer's experience and any *other circumstances which would indicate the driver was intentionally avoiding the roadblock to evade arrest or detection.*

Id. at 706 (emphasis added).

All the evidence in this case supports the conclusion that the defendant was not attempting to avoid arrest or detection by driving around the Blazer, and was not aware that he was approaching a roadblock. The roadblock had not been publicized, no warning signs or traffic cones were erected, and both troopers were invisible to the defendant as he drove up behind the wide, tarp-covered pontoon boat. Trooper Parsley admitted that it would have been possible for a motorist to mistake the roadblock for the scene of an accident. Furthermore, had the defendant been attempting to evade

---

[11]Other jurisdictions have reached similar results, concluding that a motorist's obvious attempts to avoid a roadblock may provide the reasonable suspicion sufficient for a brief, investigatory stop. See, e.g. Synder v. State, 538 N.E.2d 961, 965 (Ind. Ct. App. 1989) (holding that driver's attempts to avoid a roadblock by making a turn around "gives rise to a reasonable suspicion on the part of a police officer that the driver may be committing a crime"); Stroud v. Commonwealth, 370 S.E.2d 721, 722 (Va. Ct. App. 1988) (concluding that driver's U-turn and reversal of direction within 100 to 150 feet of roadblock gave officer reasonable suspicion for stop); Tims v. State, 760 S.W.2d 78, 79 (Ark. Ct. App. 1988) (holding that motorist's action in accelerating past roadblock provided reasonable suspicion for stop); Coffman v. State, 759 S.W.2d 573, 575 (Ark. Ct. App. 1988) (stating that motorist's turn and reversal of direction at sight of clearly marked roadblock gave officers reasonable suspicion for stop); City of Las Cruces v. Betancourt, 735 P.2d 1161, 1163 (N.M. Ct. App. 1987) (holding that motorist who proceeded past roadblock at "high rate of speed," almost hitting two officers, provided reasonable suspicion for officer to stop vehicle).

arrest, it is unlikely that he would have driven in a direction that took him toward the patrol cars. Under the unique circumstances of this case, therefore, we conclude that the defendant's action in driving around the roadblock did not provide reasonable suspicion to justify an investigative stop of his vehicle.

The trial court also found that the stop was lawful based on the statute that "when blue lights are running, the law enforcement officer is running whatever process on the road, . . . ." The trial court did not cite the specific code section, but we believe that it was referring to the following:

> **Obedience to police officers.–**(a) No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic.

Tenn. Code Ann. § 55-8-104 (1998).

Although this statute may authorize a state trooper to command a motorist to stop as part of the direction or regulation of traffic, it does not authorize the trooper to request the motorist's driver's license, in the absence of probable cause of a traffic violation or reasonable suspicion of criminal activity. To allow a trooper to demand a motorist's driver's license based solely on a state statute authorizing troopers to direct traffic would undercut the protections against unreasonable search and seizure afforded by the Tennessee and United States Constitutions, as well as the holdings of Downey and Hicks.

Accordingly, we conclude that Trooper Parsley had neither probable cause nor reasonable suspicion to make an investigatory stop.

## II. Sufficiency of the Evidence

As his second issue, the defendant argues that the evidence was insufficient to sustain his conviction for the violation of Tennessee Code Annotated Section 55-50-351. Although our determination as to the defendant's first issue makes this claim moot, we will review it because of the possibility of further appellate review.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be

given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). When the credibility of the witnesses was resolved by the jury in favor of the State, the appellate court "may not reconsider the jury's credibility assessments." State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied, ___U.S. ___, 121 S. Ct. 2600 (2001).

Applying these principles, we conclude that the evidence was sufficient for a reasonable jury to find the defendant guilty beyond a reasonable doubt. Trooper Parsley testified at trial that he asked three times to see the defendant's driver's license, but the defendant refused each time to show it to him. This testimony was arguably supported, at least in part, by testimony of Ronald Lackey, a K-9 training coordinator who had stopped at the roadblock in order to talk with Trooper Shearl. Although Lackey did not testify to hearing Trooper Parsley ask for the defendant's license, he did say that he heard Trooper Parsley ask the defendant his name, and that the defendant replied with "What's your damn name?" The defendant, on the other hand, testified that the first time he was asked for his driver's license was when he was already handcuffed and in the back of the patrol car, and that he told Trooper Parsley his license was in his wallet in his right rear pocket. The jury obviously resolved these discrepancies in the proof in favor of the State, and this court may not reconsider that assessment.

As to the defendant's claim that the indictment was deficient because it failed to track the statutory language by omitting the claim that the defendant did not display his license upon demand, we note that the indictment did allege that the defendant acted "in violation of Tenn. Code Ann. § 55-50-351." In State v. Carter, 988 S.W.2d 145 (Tenn. 1999), denying the defendant's challenge to a felony murder indictment which referred to the appropriate proscriptive statute but failed to allege that the killings were reckless, our supreme court stated:

In this case, both felony murder indictments referenced the appropriate statute. This reference provided notice to the defendant of the applicable mens rea, notice of the offense upon which to enter the judgment, and protection from subsequent prosecution on the same offense. The indictment also meets the requirements of Tenn. Code Ann. § 40-13-202. The language of the felony murder counts was legally sufficient under Ruff [978 S.W.2d 95 (Tenn. 1998)].

Id. at 149 (citations omitted).

Accordingly, we conclude that, by its reference to Tennessee Code Annotated Section 55-50-351, count two of the indictment was sufficient to put the defendant on notice as to what he was alleged to have done and to prevent reprosecution for the same offense.

## CONCLUSION

Based upon the foregoing reasoning and analysis, we reverse the judgment of conviction and dismiss the charge. The matter is remanded for further proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE