IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 8, 2007

## STATE OF TENNESSEE v. AARON LEON BURNETTE, JR.

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 06-01-0163     J. Weber McCraw, Judge**

_____

**No. W2006-02092-CCA-R3-CD  - Filed September 28, 2007**

_____

A Hardeman County Circuit Court jury convicted the appellant, Aaron Leon Burnette, Jr., of aggravated assault with a deadly weapon, vandalism of property valued one thousand dollars or more but less than ten thousand dollars, and evading arrest while operating a motor vehicle.  The trial court sentenced him as a Range II, multiple offender to ten, eight, and four years, respectively, and ordered that he serve the ten- and four-year sentences consecutively for an effective sentence of fourteen years in confinement.  On appeal, the appellant contends that (1) the trial court should have granted his motion to suppress because the police did not have reasonable suspicion to stop his vehicle; (2) the evidence is insufficient to support his convictions; and (3) the trial court improperly enhanced his sentence and ordered consecutive sentencing.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Shana C. Johnson (on appeal), Somerville, Tennessee, and Daniel J. Taylor (at trial), Jackson, Tennessee, for the appellant, Aaron Leon Burnette, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

Middleton Police Sergeant Arness Bowden testified that on the night of November 9, 2005, he was on patrol and saw a semi-tractor truck that was not towing a trailer at the intersection of Highways 125 and 57.  The truck was traveling south on Highway 125 and had working brake lights

but no taillights. Sergeant Bowden got behind the truck to initiate a stop for the taillight violation and turned on his patrol car's blue lights. The truck continued traveling on Highway 125, turned right onto Pine Crest Road, and pulled to the right side of the road. The truck did not stop but continued to roll forward slowly. The truck then accelerated "at full pace" and turned left onto South West Lane. Sergeant Bowden continued to follow the truck and saw the truck's reverse lights turn on. The truck started moving backward, and Sergeant Bowden put his patrol car into reverse, backed up, and pulled over into someone's yard. The truck backed up beside the patrol car, and Sergeant Bowden pulled forward and drove to the left of the truck in order to get out of its way.

Sergeant Bowden testified that he pulled back onto South West Lane, looked in his rearview mirror, and saw the truck moving forward. The officer knew that South West Lane was a dead-end road with an area to turn around at the end. He drove to the end of the road, turned around, and waited to see if the truck was going to drive by. When the truck did not come to the end of the road, Sergeant Bowden drove back along South West Lane. He traveled about one-half mile and saw the truck sitting in the middle of the road with its headlights turned on. Sergeant Bowden pulled his patrol car up to the truck and stopped five to ten feet away. The vehicles were facing each other. Sergeant Bowden saw the truck rock forward and immediately put his patrol car into reverse. He drove backward, pulled off to the left of the road, and rolled out of the car. As he hit the ground, the truck hit the front of his patrol car. Sergeant Bowden ran to the nearest tree and ordered the truck's driver out of the semi-tractor. The truck backed away from the patrol car, turned in Sergeant Bowden's direction, and began to move toward the officer. Sergeant Bowden thought the truck was going to run him down, feared for his life, and began shooting at the truck. He stated that he fired thirteen shots, using ten rounds from his first ammunition clip and three rounds from his second clip.

Sergeant Bowden testified that the truck stopped moving forward and that he stopped shooting at it. The dome light inside the truck turned on, and Sergeant Bowden recognized the driver as the appellant. He yelled for the driver to get out, but the truck backed up, turned around, and headed back on South West Lane toward Pine Crest Road. Sergeant Bowden stated that his patrol car sustained extensive front-end damage, that the car was not repaired, and that the city replaced it.

On cross-examination, Sergeant Bowden testified that he first turned on his blue lights to stop the truck about six-tenths of a mile before the truck got to Pine Crest Road. He acknowledged that at the appellant's preliminary hearing, he testified that he first turned on his blue lights at Pine Crest Road. He stated that his siren was not turned on and that he only wanted to stop the truck for the taillight violation. When the truck did not stop, Sergeant Bowden radioed to dispatch that he was attempting to stop an eighteen-wheeler truck. After the truck crashed into Sergeant Bowden's patrol car, the truck drove into the wooded area where Sergeant Bowden was standing, and Sergeant Bowden began shooting at the truck. He acknowledged that he was not injured during the incident, that he shot at the truck's driver's area, and that he was "shooting to kill." He stated that he did not fire any shots at the truck's passenger side or at the driver's side door.

-2-

Investigator Trent Wilbanks of the Hardeman County Sheriff's Department testified that at 10:32 p.m. on November 9, 2005, he was on duty and responded to Sergeant Bowden's radio call for assistance. Investigator Wilbanks went to South West Lane and saw a Middleton police car several feet off the road and backed a few feet away from a tree. The car's front end was "tore up," and Sergeant Bowden was in a wooded area. Investigator Wilbanks stated that both of the patrol car's airbags had deployed and that the car looked like something had hit it. The appellant's semi-tractor truck was recovered the next day in McNairy County.

On cross-examination, Investigator Wilbanks testified that an area where vehicles could turn around was at the end of South West Lane and that the area was big enough for a bus to turn around. He did not see any damage to the back of Sergeant Bowden's patrol car and recovered two bullets from the semi-tractor. He also saw "quite a few" bullet holes in the tractor, including at least two holes above the windshield. He acknowledged that most of the holes were in the front of the semi-tractor and on the passenger side, and he did not remember seeing any holes in the driver's side door or the rear of the truck. From photographs introduced into evidence at trial, Investigator Wilbanks counted thirteen bullet holes in the truck. He acknowledged that the truck's front bumper was slightly damaged and that the front license plate was slightly dented. On redirect examination, he acknowledged that one bullet could have made more than one hole.

William Monroe Jordan testified that he was the Middleton Police Chief at the time of the incident and went to the scene on November 9. The City of Middleton owned Sergeant Bowden's patrol car, a 1999 Ford Crown Victoria. The car was a total loss and was valued between six thousand two hundred dollars and six thousand seven hundred dollars. On cross-examination, Jordan testified that the city had purchased the car from the City of Lexington for two thousand five hundred dollars but had installed a lot of equipment in the car.

Deputy Robert Hitchorn of the McNairy County Sheriff's Department testified that on November 10, 2005, he heard a "be-on-the-lookout" (BOLO) over his radio. As a result, he began looking for a maroon semi-tractor with no working taillights and found the vehicle. The appellant was driving, and the truck's taillights were not working. On cross-examination, Deputy Hitchorn acknowledged that he turned on his blue lights and that the appellant stopped the truck.

Eva Jones, the Personnel Manager for Trans Carriers, testified for the appellant that the appellant leased a truck to Trans Carriers and was an owner/operator for the company. She stated that she kept records for Trans Carriers and that an October 24, 2005 inspection report for the appellant's truck showed that an inspector found a defect in the truck's two "marker lights." According to the report, a follow-up inspection was conducted on October 27, 2005, and a technician signed the report, stating that everything had been corrected. The inspection did not show any problem with the truck's taillights. The truck was inspected again on November 2, 2005, and the lights were checked "okay." On cross-examination, Jones testified that she had nothing to show the lights were working properly on November 9.

Connie Braswell, the appellant's sister, testified that on the night of November 9, 2005, she had been visiting her mother's home on South West Lane. She left her mother's house and drove north on Highway 125. She saw the appellant's truck traveling south and noticed a police car behind it. After she passed the appellant's truck and the patrol car, she looked in her rearview mirror and saw that the truck's taillights were working and that the police officer's blue lights were not turned on. She did not notice anything unusual and drove home. On December 28, 2005, Braswell videotaped the appellant's truck in a storage yard, and the videotape showed that the truck's taillights worked properly.

Margie Burnette, the appellant's mother, testified that she lived at 320 South West Lane. On the night of November 9, 2005, the appellant was supposed to stop by her house in order to pick up some documents. Between 9:00 and 10:00 p.m., she looked out her bedroom window and saw the appellant's truck pulled over to the edge of her driveway. The truck was stopped, and a police car with flashing blue lights was behind it. The police car drove around the truck and toward the end of South West Lane. Burnette stated that the appellant usually used the turn-around area at the end of the road to turn his truck around and that the appellant's truck headed toward the end of the road. Burnette went to her front door, heard the truck stop, and heard five gunshots. A few minutes later, the appellant's truck drove by Burnette's house and headed toward Pine Crest Road. Burnette stated that she did not hear a collision and acknowledged that more than five shots could have been fired. She said the appellant was proud of the semi-tractor and was "real particular" about it. On December 28, 2005, Burnette went with her daughter to videotape the truck in a storage yard. The truck was locked behind gates, and its taillights were working. On cross-examination, Burnette testified that although the appellant was supposed to pick up some documents from her on the night of November 9, he never stopped to get the documents.

Teresa Poindexter testified that she used to date the appellant and traveled with him in his semi-tractor as an authorized passenger. On the night of November 9, 2005, the appellant stopped by her house. They were supposed to "go on the road" the next day, and they inspected the appellant's truck. All of the lights on the truck worked. The appellant left Poindexter's house but returned later that night. The next day, Poindexter was riding with the appellant in the truck when the police stopped him. To her knowledge, the semi-tractor's taillights were still working at that time.

On cross-examination, Poindexter acknowledged that in a prior hearing, she testified that when the appellant first came to her home on November 9, a seventy-five-foot trailer was attached to the semi-tractor. During Poindexter's and the appellant's inspection of the truck, Poindexter was standing behind the trailer. She acknowledged that the trailer was between her and the semi-tractor's taillights and that she did not keep a log of the appellant's truck inspections.

The appellant testified that in November 2005, he was leasing his maroon 1996 Kenworth semi-tractor truck to Trans Carriers. On the evening of November 9, 2005, the appellant returned to Middleton after a trip to Kingsport. He drove the truck to Teresa Poindexter's house, and they "walked the truck over," checking its signals and lights. The appellant recently had put two new

taillights on the tractor, and Trans Carriers had inspected the lights. The appellant left Poindexter's house and dropped off the trailer he was towing at a logging company. He then drove toward his mother's house in order to pick up some documents. The appellant drove through the Highway 125/57 intersection and had just turned onto Pine Crest Road when he noticed a police car with flashing blue lights behind him. He stated that the blue lights were not flashing while he was driving on Highway 125. He also stated that he knew the his tractor's taillights were working ten minutes before he traveled through the intersection because he saw them when he unhooked the trailer from the semi-tractor.

The appellant testified that when he saw the blue lights, he "slowed to the right 'cause I wasn't sure . . . that he was after me." The police car stopped at the first house on Pine Crest Road and did not pull up behind the appellant. The appellant believed the officer was answering a call at the house and drove toward his mother's house on South West Lane. As he got to the last curve in the road, the officer "flew up behind me and turned his lights on." The appellant slowed down and pulled over near his mother's driveway. The patrol car backed up and pulled into a yard, and the appellant did not move the tractor because he did not know what the officer was doing. The patrol car then went around his truck "like he was going to a fire" and disappeared. The appellant waited, but the officer did not return. The appellant drove toward the end of South West Lane in order to turn the truck around at the end of the road, which was his normal practice. He saw that Sergeant Bowden's patrol car was in the edge of the woods and that none of the car's lights were on. Sergeant Bowden turned on his car's lights, and the appellant "started coasting over [there] to the side to see what he wanted." Sergeant Bowden got out of the patrol car, ran toward the woods, and fired four or five rounds into the front of the appellant's truck. The appellant did not know why the officer was shooting at him and "duck[ed] down out of the way." The appellant's truck rolled into the corner of the patrol car and stopped. He stated that he did not intentionally hit the officer's car and did everything he could to avoid making contact with the officer and the car.

The appellant testified that Sergeant Bowden was trying to kill him and that one of the shots struck him in the forehead. As Sergeant Bowden was loading his gun with another ammunition clip, the appellant backed the truck away. The officer shot three or four more times into the truck, striking the passenger side. As the appellant drove away, the officer shot into the back of the truck. The appellant returned to Poindexter's house and later counted seventeen bullet holes in his truck. He identified a photograph taken of him when he was arrested on November 10, 2005, and said the photograph showed a bullet wound on his head and dried blood. He said police officers beat him on November 10.

On cross-examination, the appellant testified that Sergeant Bowden did not turn on his blue lights until half-way between Pine Crest Road and South West Lane. The appellant acknowledged that he continued driving and turned onto South West Lane. He stopped on South West Lane in front of his mother's house, and Sergeant Bowden drove around him at a high rate of speed. The appellant did not go into his mother's house because he was waiting to see what the officer was going to do. The appellant then drove toward the end of South West Lane so that he could turn the truck around and stop by his mother's house. He denied that the dried blood in the photograph was a result of a

struggle he got into with police officers on November 10 and said that he never went to the hospital for treatment.

Investigator Mike Kennamore of the Hardeman County Sheriff's Department testified as a rebuttal witness for the State that he responded to the scene when the appellant was arrested on November 10. At that time, no marks were on the appellant's head. An altercation with the appellant occurred, resulting in the marks on his head that appeared in the photograph. Investigator Kennamore stated that the driver's glass on the truck was intact. Although the appellant had been charged with attempted second degree murder, aggravated assault with a deadly weapon, vandalism, and evading arrest while operating a motor vehicle, the jury convicted him only of the latter three offenses.

## II. Analysis

The appellant claims that the trial court erred by denying his motion to suppress the evidence against him and dismiss the charges. He contends that Sergeant Bowden's testimony alone was not enough to support the denial of the motion. The State contends that the trial court properly denied the motion. We agree with the State.

The appellant filed a pretrial motion to suppress the evidence and dismiss the charges filed against him, arguing that his warrantless traffic stop on November 9, 2005, was unreasonable. At the suppression hearing, Sergeant Bowden, Eva Jones from Trans Carriers, Connie Braswell, Teresa Poindexter, and Margie Burnette testified. All of the witnesses gave testimony that was very similar to their trial testimony. In pertinent part, Sergeant Bowden testified at the hearing that the appellant's semi-tractor taillights were not working on the night of November 9 and that public safety was his only reason for attempting to stop the appellant. Jones testified that although an inspection of the appellant's truck on October 24 showed that the appellant's "marker lights" were not working, the problem was corrected and that inspections on October 27 and November 2 showed the truck's lights "checked okay." She also stated that she thought "marker lights" were on the side of the semi-tractor and that she did not know if the appellant's taillights were working on November 9. Braswell testified that she saw the patrol car closely following the appellant's semi-tractor on Highway 125 on the night of November 9, that she looked in her rearview mirror, and that she saw the semi-tractor's taillights were working. Poindexter testified that she helped the appellant with his pre-trip inspection on the night of November 9 and that, although a trailer was hooked to the semi-tractor during the inspection, the semi-tractor's taillights were working. Burnette testified that on the night of November 9, she could see the appellant's semi-tractor from her window and that the taillights were working.

In a written order, the trial court noted that the appellant had produced witnesses who testified that the taillights were operable at the time of the stop. However, the trial court also noted that Sergeant Bowden testified that the lights were not working, a Tennessee traffic law violation. The trial court concluded that the officer "had probable cause to believe that a traffic violation had occurred" and denied the appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. The purpose of the Fourth Amendment and article 1, section 7 is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967)). Police activity involving the stop of an automobile qualifies as a seizure under both the state and federal constitutions. Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); State v. Westbrooks, 594 S.W.2d 741, 743 (Tenn. Crim. App. 1979). Ordinarily, a law enforcement officer may conduct a brief investigatory stop only if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968). A police officer's witnessing a traffic violation provides reasonable suspicion and probable cause for a stop. State v. Levitt, 73 S.W.3d 159, 172-73 (Tenn. Crim. App. 2001). In this state, two operating taillights are required on all trucks manufactured after January 1, 1968. See Tenn. Code Ann. § 55-9-402(b)(1), (c).

Sergeant Bowden testified at the suppression hearing and at trial that when the appellant's semi-tractor traveled through the Highway 125/57 intersection on the night of November 9, 2005, he noticed that the truck's taillights were not working and that he initiated a stop for that reason alone. We note that Deputy Hitchorn also testified at trial that the taillights were not working when he stopped the appellant's truck on November 10. Although the appellant's friend, sister, and mother testified that the taillights were working on November 9, the trial court obviously accredited Sergeant Bowden's testimony. Given the evidence presented at the trial and at the suppression hearing, we cannot say that the evidence preponderates against the trial court's finding that the lights were not working and that the officer could stop the appellant for the traffic violation. The trial court properly denied the appellant's motion to suppress.

B. Sufficiency of the Evidence

Next, the appellant contends that the evidence is insufficient to support the convictions. Specifically, he contends that the evidence is insufficient to support the aggravated assault conviction because Sergeant Bowden was already out of the patrol car and some distance away from it when the truck hit the car, because the officer's behavior that night was "erratic," and because the officer's fear of injury "seem[ed] to come and go." As to the vandalism conviction, the appellant contends that the evidence is insufficient because the appellant's truck "rolled" into the patrol car, and there is no evidence he knowingly damaged the car. Finally, as to the evading arrest conviction, the appellant contends that the evidence is so confusing and contradictory that there is no way the evidence is sufficient to show that the appellant attempted to elude Sergeant Bowden. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As charged in the indictment, a person commits aggravated assault when the person uses a deadly weapon to intentionally or knowingly cause another person reasonably to fear imminent bodily injury. Tenn. Code Ann. § 39-13-102(a)(1)(B), -101(a)(2). A motor vehicle can be a deadly weapon. See, e.g., State v. Lewis, 978 S.W.2d 558, 565 (Tenn. Crim. App. 1997). Vandalism occurs when a person "knowingly causes damage to . . . any real or personal property of another or of the state, the United States, any county, city, or town knowing that the person does not have the owner's effective consent." Tenn. Code Ann. § 39-14-408(a). Evading arrest by operating a motor vehicle occurs when a person operating a motor vehicle on any street, road, alley, or highway in this state intentionally flees or attempts to elude a law enforcement officer after the person has received a signal from the officer to stop. Tenn. Code Ann. § 39-16-603(b)(1).

Taken in the light most favorable to the State, the evidence shows that Sergeant Bowden saw the appellant traveling on Highway 125 in a semi-tractor without working taillights and that the officer turned on his blue lights to initiate a traffic stop. The appellant saw the blue lights, but failed to stop and turned onto Pine Crest Road. He pulled over to the right, slowed down, accelerated, and turned onto South West Lane. When he arrived at his mother's driveway, he stopped the truck and backed it toward Sergeant Bowden's patrol car. Sergeant Bowden went around the truck and drove

to the turn-around area at the end of South West Lane to wait for the appellant. When the appellant did not drive to the end of the road, Sergeant Bowden drove back up South West Lane and pulled up to the appellant's semi-tractor. The appellant put the truck into gear and moved forward, forcing Sergeant Bowden to back up until he reached the end of the road. The appellant intentionally continued to drive forward, and the officer, realizing that the semi-tractor was going to hit his patrol car, jumped from the vehicle. The truck hit the car, resulting in a total loss of Middleton's property, and the appellant turned the semi-tractor toward the officer and drove toward him. Officer Bowden testified that he believed the appellant was going to run him down, that he feared for his life, and that he shot at the semi-tractor. The appellant then fled from the scene. This evidence is sufficient to support the appellant's convictions for aggravated assault with a deadly weapon, vandalism, and evading arrest.

### C. Excessive Sentence

The appellant contends that the trial court erred by applying enhancement factors and ordering consecutive sentencing as a dangerous offender. The State contends that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Sergeant Rick Chandler from the Hardeman County Sheriff's Department testified that he had had contact with the appellant over the years and acknowledged that the appellant had directed violence toward law enforcement officers previously. Specifically, he stated that on November 3, 2005, six days before the crimes in question, the appellant was transferred to the Hardeman County Sheriff's Department from east Tennessee and was upset about having been arrested. The appellant told Sergeant Chandler that Police Chief Monroe Jordan had called the highway patrol and had the patrol set up a roadblock to stop the appellant. The appellant told Sergeant Chandler that "it was a plot against him personally by the police department and that he would get Chief Jordan and that he would kill Chief Jordan." Sergeant Chandler also stated that he once responded to a disturbance at the appellant's house, that the appellant tried to assault Deputy Tracey Jones with a chainsaw, and that he arrested the appellant.

Middleton Police Chief Lynn Webb testified that he also had had contact with the appellant and had arrested the appellant previously. He stated that "[i]f you arrest [the appellant], better be ready to fight him. You had to fight him." On cross-examination, he testified that he had arrested the appellant a couple of times and that every time he arrested the appellant, "we had to fight." When asked if he liked the appellant, the officer stated, "Well, I don't like to have to fight somebody, no, sir."

The presentence report was introduced into evidence. According to the report, the then thirty-nine-year-old appellant was married with five children. The report shows that he dropped out of high school after the ninth grade in order to get married and raise a child. The appellant stated in the report that he received his GED in 1991 and attended truck driving school. The appellant reported that he had used marijuana and cocaine previously and began drinking beer when he was fifteen years old. The report shows that the appellant received mental health treatment for depression

at Quinco and Western Mental Health, and he stated that he had been treated by a doctor for manic depression. The appellant's prior criminal history shows that he began committing crimes when he was twenty years old and spans multiple pages of the report. It includes multiple convictions for resisting arrest, driving under the influence (DUI), vandalism, reckless driving, driving on a revoked or suspended license, misdemeanor assault, and public intoxication.

The trial court stated that it had considered the evidence at trial and the sentencing hearing, the presentence report, enhancement and mitigating factors, the appellant's potential for rehabilitation, and the principles of sentencing. It concluded that the appellant was a Range II, multiple offender and applied enhancement factors (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and (19), that the appellant was convicted of aggravated assault and the victim was a law enforcement officer performing an official duty and the appellant knew or should have known the victim was a law enforcement officer. Tenn. Code Ann. § 40-35-114(1), (19). In mitigation, the trial court recognized the appellant's employment history. See Tenn. Code Ann. § 40-35-113(13). The trial court ordered that the appellant serve the maximum punishments in the range for each offense, which was ten years for aggravated assault, a Class C felony; eight years for vandalism of property valued one thousand dollars or more but less than ten thousand dollars, a Class D felony; and four years for evading arrest, a Class E felony. See Tenn. Code Ann. § 40-35-112(b)(3), (4), (5).

Regarding consecutive sentencing, the trial court concluded that the appellant had an extensive criminal history and was a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2), (4). In ruling that the appellant was a dangerous offender, the trial court stated as follows:

> The Court further finds that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The Court further finds the circumstances surrounding the commission of the offense were aggravated, that the confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-society lifestyle, and that the length of the sentence reasonably relates to the offense of which the defendant stands convicted.

The trial court ordered that the appellant serve the four-year sentence consecutively to the ten-year sentence and that he serve the eight-year sentence concurrently with the other two.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered

by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Regarding the enhancement factors, the appellant argues, without any explanation, that the trial court improperly enhanced his sentences to the maximum in the range for each conviction. However, the trial court obviously gave great weight to the factors. Given the appellant's extensive criminal history, that factor alone was entitled to great weight and was sufficient to result in the maximum sentence for each conviction.

As for consecutive sentencing, a trial court may impose consecutive sentences if the defendant is "an offender whose record of criminal activity is extensive" or if a defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4). In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), the dangerous offender provision, is not sufficient by itself to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Wilkerson, 905 S.W.2d at 938. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Initially, we note that the appellant's extensive criminal history alone warrants consecutive sentencing in this case. Moreover, the trial court specifically addressed the Wilkerson factors and made specific findings regarding those factors. Given the facts of this case, we agree with the trial court that the appellant qualified as a dangerous offender and that consecutive sentencing is appropriate.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-11-