IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2019 Session

## TABORIS RAMON JONES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 24044    Robert L. Jones, Judge**

_____

### No. M2018-00711-CCA-R3-PC

_____

The Petitioner, Taboris Ramon Jones, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury conviction for possession with intent to sell 0.5 grams or more of cocaine in a drug-free school zone. On appeal, the Petitioner alleges that trial counsel provided ineffective assistance, that his sentence is unconstitutional, and that he was deprived of a fair trial on the basis of cumulative error. After a thorough review of the record, we affirm the judgments of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

John M. Schweri, Columbia, Tennessee, for the appellant, Taboris Ramon Jones.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Brent Cooper, District Attorney General; and Jonathan Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND[1]

On February 19, 2015, the Maury County Grand Jury charged the Petitioner with possession with intent to sell 0.5 grams or more of cocaine, a Schedule II controlled substance, in a drug-free school zone, possession of less than 0.5 ounces of marijuana, a Schedule VI controlled substance, and improper display of a license plate. See Tenn. Code. Ann. §§ 39-17-417(a)(4), 39-17-418, 39-17-432(b), 55-4-110. The Petitioner pled

_____

[1] Our review of the facts will be limited to those relevant to the issues on appeal.

guilty to the traffic and marijuana possession charges and received a sentence of ten days. The Petitioner proceeded to trial on the cocaine charge and was convicted. Pursuant to statute, he received a mandatory minimum sentence of fifteen years at one hundred percent service. See State v. Taboris Jones, No. M2015-02515-CCA-R3-CD, 2017 WL 2493684, at *1 (Tenn. Crim. App. June 9, 2017), perm. app. denied (Tenn. Nov. 16, 2017).

The proof at trial established that on the evening of April 7, 2014, Spring Hill Police Officer Jason Lovett, who was assigned to the Drug Task Force, pulled over the Petitioner's truck because no light was illuminating the Petitioner's license plate. Jones, 2017 WL 2493684, at *1. The area in which the Petitioner was pulled over was near an elementary school. Id. While Officer Lovett checked the Petitioner's registration information, Deputy Joey Parks arrived and asked the Petitioner to exit his truck; he also asked for permission to search the truck and whether the Petitioner had anything illegal in the truck. Id. The Petitioner became "extremely irate," cursed at Deputy Parks, and accused the officers of pulling him over because he was African-American. Id.

A police dog sniff search of the car was conducted, and Officer Lovett's police dog indicated the presence of contraband at the driver's side door seam. Jones, 2017 WL 2493684, at *1. Officer Lovett informed the Petitioner that he was going to search the truck because the dog had detected a "narcotic odor," and the Petitioner fled. Id. After the officers lost sight of the Petitioner and Deputy Parks alerted dispatch, Officer Lovett continued to search the truck, where he found a green pill bottle, a digital scale containing white residue, and a marijuana cigarette. Id. Tennessee Bureau of Investigation laboratory testing indicated that 3.03 grams of cocaine base were present inside baggies found in the pill bottle. Id. at *2.

Officer Lovett was thereafter qualified as an expert in narcotics investigation, and he testified a "20-rock" of cocaine weighed approximately 0.1 grams[2] and cost about twenty dollars. Jones, 2017 WL 2493684, at *2. Officer Lovett stated that if he were trying to determine whether a person used cocaine, he would have looked for a pipe or an "S.O.S. pad"; in contrast, if he were trying to determine whether a person sold cocaine, he would look for "multiple baggies, digital scales, and currency." Id. Officer Lovett did not find evidence of cocaine use in the Petitioner's truck, but he found "everything that [the Petitioner] needed to sell cocaine" aside from currency. Id. Officer Lovett had never found digital scales on a cocaine user previously. Id. He opined that the Petitioner was "more of a seller of cocaine rather than a user" and that the cocaine recovered in the Petitioner's truck was worth about five hundred dollars. Id. Officer Lovett

---

[2] The testimony at the post-conviction hearing established that Officer Lovett stated multiple weights for a "20-rock," which was relevant to one of the grounds of ineffective assistance.

acknowledged that the Petitioner turned himself in about two days after the traffic stop. Id. Deputy Parks testified that the Petitioner stated that he was upset during the traffic stop due to an argument with his "significant other." Id.

Maury County Sheriff's Lieutenant William Doelle, an expert in narcotics investigation, testified that the traffic stop occurred 936 feet from an elementary school, although he later stated that he did not know the exact location where the Petitioner was stopped. Jones, 2017 WL 2493684, at *3. He testified consistently with Officer Lovett regarding the items found on a drug user versus a drug seller. Id. Lieutenant Doelle also noted that it was uncommon to find digital scales on a drug user and that a drug user did not generally leave behind the "amount of residue" found in the pill bottle. Id. He agreed that a "heavy crack cocaine user" could use up to three grams of cocaine in "a day to a day and a half." Id. He stated, though, that in his experience it was uncommon for a person to buy two to three grams of crack cocaine for personal use. Id.

The Petitioner testified that on the evening of April 7, 2014, he had not driven his truck in two weeks and that he had left the truck at a friend's house for repairs. Jones, 2017 WL 2493684, at *4. The Petitioner also stated that other friends had previously borrowed his truck and that it usually sat unlocked in the Petitioner's driveway. Id. After a disagreement with his wife over his borrowing her car, the Petitioner was taking a pair of shoes to his daughter in his truck when he was pulled over. Id. He did not know that the license plate light was not working. Id. The Petitioner was frightened when Deputy Parks "pop[ped] up" on the passenger's side of the truck, and the Petitioner exited the truck to ask if he had done anything wrong. Id. Deputy Parks did not answer his question, would not make eye contact, and repeatedly asked the Petitioner "where are the guns[.]" Id. The Petitioner asked Deputy Parks if he was racist; Deputy Parks "got out of control" and "was being demanding"; and the Petitioner felt "belittled." Id. The Petitioner saw a police dog exit Officer Lovett's car, and the Petitioner gave consent for Deputy Parks to search his person but not his truck. Id. The Petitioner was aware that there were two "marijuana roaches" in the truck's ashtray. Id.

The Petitioner stated that the police dog circled the truck three times without giving a signal but that Officer Lovett nevertheless began to search the truck. Jones, 2017 WL 2493684, at *5. The Petitioner further stated that Deputy Parks said he "wouldn't be doing this to" the Petitioner but for the Petitioner's asking if he was racist. Id. The Petitioner said that he "ran for [his] life" and that Deputy Parks "threw a lighter at him and said that shots had been fired." Id. The Petitioner later came back to the scene and found his truck sitting unattended with the door open. Id. He denied knowing the cocaine or scales were in the truck or how they got there; he stated that he did not use crack cocaine and denied that the cocaine was his. Id. The Petitioner turned himself in two days later. Id. The Petitioner acknowledged that at the time of the traffic stop, he

-3-

was nowhere near the area where he was supposed to be traveling. Id. The Petitioner admitted that he drove past an elementary school at the intersection at which Officer Lovett first saw his truck. Id. The jury convicted the Petitioner as charged.

On direct appeal, the Petitioner challenged the sufficiency of the evidence and the applicability of the Drug Free School Zone Act to his conviction. Jones, 2017 WL 2493684, at *1. This court concluded that the jury had discredited the Petitioner's testimony and that the evidence was sufficient to establish that the Petitioner was stopped in a school zone with three grams of cocaine, items that were typical of selling cocaine, and no items to indicate he was a cocaine user. Id. at *6. Relative to the Petitioner's contention that the Drug Free School Zone Act should only apply to cases in which the defendant intended to sell drugs within 1,000 feet of a school, this court concluded that "[b]ecause the Drug Free School Zone Act does not require a specific mens rea, the State is not required to show that the [Petitioner] knowingly possessed the cocaine with intent to sell the cocaine within 1,000 feet of a school." Id. at *7.

The Petitioner filed a June 30, 2017 pro se petition for post-conviction relief alleging ineffective assistance of counsel; the post-conviction court thereafter appointed counsel, and post-conviction counsel filed an amended petition on January 31, 2018, after our supreme court denied permission to appeal relative to the direct appeal. The amended petition raised numerous allegations of ineffective assistance, as well as the disproportionality of the Petitioner's fifteen-year sentence. Relative to the issues on appeal, the Petitioner challenged trial counsel's investigation of the case; counsel's effectiveness relative to presenting the defense at trial; and counsel's communication with the Petitioner, including announcing that the Petitioner would testify before the Petitioner had made that decision.

At the post-conviction hearing, Deputy Parks[3] testified that he was not familiar with the Petitioner prior to his arrest. Deputy Parks agreed that he did not measure the distance between the traffic stop and the elementary school. He did not recall whether anyone asked the Petitioner for consent to search his truck and noted that he had not reviewed the case and did not remember anything specific about it. Deputy Parks did not know if the traffic stop was delayed "due to a potential outstanding warrant." Trial counsel did not discuss the case with Deputy Parks before trial. Deputy Parks did not order DNA or fingerprint testing on the seized items and did not know if other officers did so. Deputy Parks did not remember if a video of the traffic stop existed, and he noted that only some police vehicles were equipped with cameras. Deputy Parks stated that he drove a second police cruiser separate from Officer Lovett. He did not remember

---

[3] The record reflects that both Deputy Parks and Officer Lovett held the rank of sergeant at the time of the post-conviction hearing. For clarity, we will refer to the testifying officers by their rank at the time of trial.

-4-

whether he had a police dog in his cruiser, and to his recollection, Officer Lovett's police dog performed the sniff search of the Petitioner's truck.

Deputy Parks testified that it was Officer Lovett's decision to conduct the sniff search and that Officer Lovett was the "primary" officer at the traffic stop. Deputy Parks noted that he and Officer Lovett worked together and that when one of them initiated a traffic stop, the other would also respond. Deputy Parks stated that he asked the Petitioner about narcotics, "which led [him] to ask [the Petitioner] for a consent search." Deputy Parks did not perform a field test on the set of scales. After the police dog indicated the presence of contraband and Officer Lovett began to search the vehicle "up underneath the seat," the Petitioner "took off running." Deputy Parks attempted to "throw a [Taser]" at the Petitioner, and he noted that it was "typical procedure" to shock a fleeing suspect with a Taser when a police dog had indicated the presence of contraband. Deputy Parks did not remember whether he patted down the Petitioner, but he noted that he generally asked for consent to search a person and would perform a pat-down for weapons if the person refused. The search of the truck was performed partially before and partially after the Petitioner's flight. Deputy Parks agreed that there was no search warrant, that the Petitioner did not consent to the search, and that to the "[b]est [he] recollecte[d]," the Petitioner's truck was impounded. Deputy Parks did not remember if a felony evading arrest charge was dismissed in relation to this case. Upon questioning by the post-conviction court, Deputy Parks agreed that, generally, evading arrest on foot was a misdemeanor.

Officer Lovett testified that he was not familiar with the Petitioner before his arrest. He did not recall having asked the Petitioner about guns, but he noted that he generally asked motorists if they had illegal drugs or weapons in their cars. He did not know of a particular event that would have triggered a "heightened awareness" of guns on that night. Officer Lovett thought that Lieutenant Doelle[4] measured the distance between the traffic stop and the elementary school after the issuance of the Petitioner's arrest warrant. Officer Lovett noted that the intersection where he first saw the Petitioner's truck was one hundred and fifty feet from the elementary school. Officer Lovett agreed that he asked for consent to search the Petitioner's truck; he did not remember if Deputy Parks searched the Petitioner. Officer Lovett was not aware of a delay during the traffic stop "due to an outstanding warrant that the system was showing that eventually was found not to exist."

Officer Lovett denied that trial counsel interviewed or communicated with him prior to trial. Officer Lovett stated that in "these cases," depending on the case, he might

---

[4] Lieutenant Doelle, who at the time of the post-conviction hearing was director of the 22nd Judicial District Drug Task Force, was referred to repeatedly as "Dowley." We will refer to Director Doelle's rank at the time of trial and use the correct name where references to Dowley were made in the transcript.

order DNA or fingerprint testing, particularly if multiple people were present in the car. Officer Lovett did not remember whether the Petitioner told him other people had been driving his truck. Officer Lovett's police cruiser was not equipped with a camera. He stated that it was his practice to conduct a police dog sniff search of vehicles during every traffic stop, including stops for an unilluminated license plate, and to call dispatch for a backup officer. Officer Lovett did not remember how long the traffic stop lasted before the Petitioner fled. Both Officer Lovett and Deputy Parks chased the Petitioner on foot.

Officer Lovett recalled that his police dog circled the truck twice, that it exhibited "changed behavior" on the first circle, and that it gave a "positive trained alert" on the second circle. No cash was found on the Petitioner at the time of his arrest. Officer Lovett agreed that if a person possessed cash, scales, or "other paraphernalia," that it could be indicative of the person's selling drugs rather than using them. If Officer Lovett called Spring Hill, he would use his cell phone because his radio signal did not reach Maury County. Officer Lovett stated that he generally would have called police dispatch himself, but he noted that there was no rule against Deputy Parks's doing so. Officer Lovett indicated that the Petitioner had been charged with misdemeanor evading arrest because he fled on foot.

Trial counsel testified that he represented the Petitioner at trial and that another attorney represented the Petitioner at the preliminary hearing. The original charges were possession 0.5 grams or more of cocaine within one thousand feet of a school, simple possession of marijuana, and misdemeanor evading arrest. Counsel was unsure whether the Petitioner had been charged with failing to have an illuminated license plate, which was the basis of the initial traffic stop. The evading arrest charge was dismissed at the preliminary hearing. The Petitioner hired counsel in spring 2015, and counsel appeared in court in May, June, and July 2015. After being unable to settle the case, the Petitioner proceeded to trial on August 25, 2015. The Petitioner met with counsel at counsel's office when counsel was retained, at the Petitioner's three court appearances, and "once or twice" about one week prior to trial. Counsel also recalled speaking to the Petitioner on the telephone before trial. Counsel's meetings with the Petitioner before trial lasted about one hour each. When asked whether the length of meeting was typical of a Class A felony trial, counsel responded that it depended on the type of felony and the number of witnesses.

Trial counsel testified that the trial date was reset because he was attempting to obtain the police dispatch record of the calls Officer Lovett made to Spring Hill. Counsel issued a subpoena to Maury County 9-1-1 listing two dates, as set out in the officer's report and the indictment, and was told they did not have any records from those dates. Counsel subsequently issued a subpoena to the Spring Hill Police Department and received the same response. Counsel was unaware at the time that he had requested

records from 2015 instead of 2014. Counsel had telephone conversations with the police department and the prosecutor regarding the dispatch records, and they were unable to find the relevant records. Counsel was searching for the records to determine if a suppression issue existed relative to a delay during the stop. Counsel did not ultimately file a suppression motion. Counsel noted that he sometimes filed suppression motions in drug cases involving traffic stops, citing case law that held where traffic stops were prolonged in order to conduct a police dog sniff search, the evidence was suppressed. Counsel stated that he did not believe a suppression issue existed in the Petitioner's case because the officers' testimony established that Officer Lovett was still waiting for the information check to come back when the sniff search was conducted. Counsel denied having read State v. Levitt, 73 S.W.3d 159 (Tenn. Crim. App. 2001), during his suppression research.[5] Counsel stated that his grandfather worked in the area where the Petitioner's traffic stop occurred and that he was "very familiar" with the area. Counsel drove through the area after being hired in order to "see where [the Petitioner] had ran[.]" Counsel did not take any measurements, although he noted that he knew the intersection of 17th Street and Highland, where Officer Lovett first saw the Petitioner's truck, was within one thousand feet of a school. Counsel acknowledged that if the Petitioner had driven sixty feet further, he would have been outside of the school zone.

Counsel testified that a plea offer existed for the Petitioner to serve eight years at thirty percent service in exchange for pleading guilty to Class B felony possession of cocaine in a "non-drug free zone." Counsel reviewed the offer with the Petitioner and advised him to take it, but the Petitioner did not wish to accept the offer. Counsel advised the Petitioner that was facing a fifteen-year sentence at one hundred percent service. The Petitioner "did not want to serve any time." The Petitioner maintained that other people had access to the car and that he did not know the cocaine was under the driver's seat of his truck. After the Petitioner's trial, he wrote counsel a letter asking if he could still accept the offer.

Trial counsel testified that although the Petitioner had prior convictions, they did not involve drugs. When asked whether a discussion with the Petitioner occurred regarding "the mere fact of driving through a drug-free zone [didn't] mean that [the Petitioner was] going to get convicted of an A felony[,]" counsel responded, "[The Petitioner] claimed that. I never told him that. I knew the status of the law at that point in time that merely driving through a drug-free zone is enough to sustain a conviction[.]" Counsel noted that he did not "like that law" and that the trial court commented during

---

[5] In Levitt, this court concluded that a traffic stop at an unmarked roadblock was an unreasonable seizure because a compelling state interest was not shown and because the roadblock failed "to be established and operated in a manner that minimized its intrusiveness on individual freedom." 73 S.W.3d 159, 171-72. In addition, this court concluded that the defendant's driving slowly around the roadblock on a wide, paved shoulder of the road did not give rise to reasonable suspicion for the traffic stop. Id. at 173-75.

the motion for a new trial hearing that "he really didn't like the law either but that's the status of the law at the time." Counsel stated that he raised the issue of the law's application to the Petitioner in the direct appeal and that he applied for permission to appeal to our supreme court.

Relative to the direct appeal, trial counsel testified that he incurred $1,995 in out-of-pocket costs to have the transcript prepared after a series of administrative issues in which he failed to have the Petitioner declared indigent in time to be appointed as counsel.

Trial counsel raised on appeal the sufficiency of the evidence and "the main issue . . . involving the drug-free zone." Counsel noted that his sufficiency argument "was not a strong argument" due to the presumption of possession for resale that arose from the amount of cocaine involved and the presence of scales in the truck. Counsel further noted that the two most damaging aspects of the case were the Petitioner's running from police, the quantity of cocaine, and the presence of cocaine residue on the scales. Counsel agreed that the Petitioner denied the cocaine was his but admitted to possessing the marijuana in the truck. Counsel stated that he cross-examined one of the officers about whether DNA or fingerprint testing had been done and that the officer testified that testing was not performed. When asked whether counsel would typically have requested independent evidence testing, he responded, "I guess I could have . . . but it could have been picked up both ways, too. It could have been you get it tested and his fingerprints are on there and then the State's got even stronger proof."

Trial counsel denied knowing that the Petitioner had bipolar disorder and stated that the Petitioner never indicated having such a diagnosis. Counsel noted that the Petitioner never appeared to have "any kind of mental health problems" and that the Petitioner communicated and answered counsel's questions. Counsel did not file a "mitigating factors defense" and noted that the Petitioner received the minimum sentence of fifteen years. Counsel did not remember if the sentence was agreed-upon or whether there was a "sentencing by jury." Counsel agreed that he read the presentence report, including the Petitioner's self-reporting that he had bipolar disorder and had not taken medication for four months prior to the presentence report. Counsel agreed that if he had known the Petitioner had bipolar disorder, he would have requested a mental health evaluation in the trial court. Counsel reiterated that at no point in his representation of the Petitioner did he suspect that the Petitioner had mental health issues. Counsel noted that the Petitioner wrote letters to him that were "fluid, coherent, [and] well-spoken." When asked whether he was aware that the Petitioner received social security benefits as a result of being unable to work due to bipolar disorder, counsel responded that the Petitioner told him and subsequently testified at trial that he had been working up until the time of trial.

Trial counsel testified that he and the Petitioner discussed the Petitioner's right to testify, although counsel did not remember exactly when the discussion occurred. Counsel said, though, that to his recollection the trial court "went over Momon." [6] Counsel recalled telling the Petitioner that counsel "needed to put [the Petitioner] on" as a witness so that the Petitioner could tell the jury the drugs were not his and explain why he ran from the police. Counsel stated that he had practiced law for seventeen and one-half years and that he had seen similar cases where a traffic stop for an equipment violation led to "questions about guns and drugs and eventually a search." Counsel noted that the Drug Task Force pulled over motorists for traffic or equipment violations and had "to try to get their police dog there quick so they [could] try to run the dog around while they're still . . . gathering the information" in order to expose other crimes.

Trial counsel testified that during his investigation of the case, he did not find that the Petitioner's traffic stop had been delayed due to a "potential outstanding warrant issued." Counsel recalled that at trial, Officer Lovett testified that Deputy Parks arrived while Officer Lovett was still at the Petitioner's window obtaining his information and that the police dog was walked around the car while Officer Lovett waited for Spring Hill dispatch to call back his cell phone with the Petitioner's registration information. Officer Lovett further testified that the dog indicated at the second "run around" and Officer Lovett began searching the truck, where he found the green pill bottle under the front seat. The officers testified that Deputy Parks stood with the Petitioner during the search and that the Petitioner ran away; both officers pursued the Petitioner.

When asked whether it was typical to continue to search a vehicle after a traffic stop for an equipment violation and a pat-down, trial counsel responded that if the police dog indicated the presence of contraband during a sniff search, the officers had probable cause to search. Counsel stated that the Petitioner did not prolong the stop. Counsel stated that after making a motion regarding allowing questioning about the Petitioner's prior aggravated robbery conviction, the trial court allowed the prosecutor only to ask the Petitioner if he had a prior theft conviction, not robbery. Counsel raised the topic on direct examination to "un-ring the bell . . . and maybe have [a] lesser effect[.]"

Trial counsel testified that both Officer Lovett and Lieutenant Doelle testified as expert witnesses. Counsel did not recall whether Officer Lovett was certified as an expert in narcotics. Counsel noted that Officer Lovett's testimony was "a lot more confusing" than that of Lieutenant Doelle. As an example, counsel noted Officer's Lovett's describing a "20-rock" first as containing one gram of cocaine, then later as

---

[6] Referring to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), where our supreme court outlined a prophylactic procedure designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent, and futher, that he understands that he has a right to testify.

containing between 0.7 and 0.9 grams of cocaine. Lieutenant Doelle testified that a 20-rock contained 0.1 grams of cocaine. Counsel surmised that the State's argument was that the Petitioner possessed "20 rocks" and noted that on cross-examination, Lieutenant Doelle admitted that a "heavy crack user" could consume three grams of cocaine in two days. When asked whether he generally would have objected to the quality of testimony Officer Lovett gave, counsel stated that after voir dire, he felt that the trial court was going to qualify Officer Lovett as an expert and that any confusion during Officer Lovett's testimony in comparison to Lieutenant Doelle's testimony served to discredit Officer Lovett.

Trial counsel testified that although he did not speak to Officer Lovett or Deputy Parks before trial, he was able to contact Lieutenant Doelle. Counsel did not remember any "major issues" when comparing Officer Lovett's and Deputy Parks's chronologies of the relevant events. Counsel recited a summary of the officers' testimony and the Petitioner's contention that he felt intimidated and targeted due to his race.

When asked whether he discussed with the Petitioner "any other cases successfully appealed regarding driving through a drug-free zone," trial counsel responded that he told the Petitioner "the status of the law was simply driving through the zone was enough" to be convicted. Counsel noted that he explained that if the jury believed the cocaine was of a sufficient amount and the Petitioner intended to sell it, the Petitioner should "look kind of hard" at the plea offer of eight years at thirty percent service. Counsel reiterated that the Petitioner did not "want anything to do with" the plea offer because he maintained that he was unaware the cocaine was in the truck. The Petitioner did not want to serve any time in prison. Counsel stated that he "would have never told [the Petitioner] that . . . he had to actually sell" cocaine inside a drug-free zone in order to be convicted.

Trial counsel agreed that in the motion for a new trial and on appeal, he argued for an interpretation of the relevant statute requiring proof of the intent to sell drugs inside the drug-free zone. Counsel explained that he raised the issue "in hopes that maybe [this court or our supreme court would] take a second look at it and maybe change their mind about it." Counsel noted the trial court's discussion of the fact that a person who sold drugs to a child outside of a school zone faced an eight-to-twelve-year sentence, whereas a person who intended to sell drugs to an adult and was caught with the drugs in a school zone faced a fifteen-to-twenty-five-year sentence.

Trial counsel testified that he did not call character witnesses. The Petitioner testified regarding his theory that a friend to whom he had lent the truck left the cocaine there. Counsel noted that he did not expect any of the Petitioner's friends to admit ownership of the cocaine. Counsel stated that he discussed with the prosecutor the

potential witnesses and that the State did not call any unanticipated witnesses at trial. Counsel said that he reviewed the preliminary hearing transcript and listened to the hearing recording. When asked whether discrepancies existed between the officers' preliminary hearing and trial testimonies, counsel stated, "There was one point, I wouldn't say it was [a] discrepancy but it . . . [came] out about the State maybe wanting a White instruction,[7] which I believe the [trial court] did give." Counsel noted his argument at trial that he be permitted to question Officer Lovett regarding the dismissed evading arrest charge in order to "offset" the State's emphasis on the Petitioner's fleeing from police. Counsel further noted that in order to combat the State's argument regarding the lack of drug paraphernalia in the truck, counsel emphasized that no large sums of cash or small plastic bags were found in the truck and that the truck was not seized pursuant to civil forfeiture.

Trial counsel denied telling the jury that the Petitioner smoked crack cocaine, although he argued in the context of simple possession that the Petitioner could have afforded three grams of cocaine for personal use. Counsel stated that he stipulated to the elementary school's status for purposes of the drug-free zone statute. Counsel denied that there was any trial preparation he intended to do but ultimately did not do. Counsel denied that the Petitioner requested any items before trial that he failed to receive, with the exception of the subpoenaed dispatch records, which did not seem to exist.

Post-conviction counsel allowed the Petitioner to question trial counsel. Upon questioning by the Petitioner, trial counsel testified that he recalled discussing the Petitioner's driving his wife's car while his truck was being repaired by a friend. Counsel did not recall the Petitioner's hypothesizing that his wife put the cocaine in the truck or telling the Petitioner to forego mentioning his theory in front of the jury. Counsel did recall the Petitioner's arguing with his wife about "putting miles on" her car on the night of the traffic stop.

On cross-examination, trial counsel denied that he ever questioned the Petitioner's competency to stand trial or assist counsel in his defense. To prepare for trial, counsel filed a motion for discovery; discussed the case with the Petitioner and the prosecutor; researched "police dog issues" and the circumstances of the traffic stop relative to a possible suppression motion; tried to obtain the dispatch recording; tried to negotiate a plea offer and conveyed the offer; explained to the Petitioner the benefits of the plea offer and the risk of going to trial; argued to keep out evidence of the Petitioner's prior conviction; and developed the arguments that the cocaine did not belong to the Petitioner or, alternatively, that the cocaine was for personal use. Counsel did not interview Officer

---

[7] A "White instruction" generally refers to a required jury instruction in cases involving a kidnapping and another felony. See State v. White, 362 S.W.3d 559, 580-81 (Tenn. 2012).

Lovett and Deputy Parks because he reviewed the preliminary hearing testimony, knew what their trial testimony would be, and did not believe a suppression issue existed.

On redirect examination, trial counsel identified a letter the Petitioner sent him after trial, in which the Petitioner requested a copy of the arrest warrant affidavit and asked about the possibility of accepting the plea offer. Counsel noted that the Petitioner claimed in the letter counsel told him the State had to prove he "was making a sale in the school zone," which counsel denied. When asked whether the Petitioner was confused because there was not enough time to fully discuss the issue or the Petitioner had "comprehensive [sic] issues," counsel responded that after discussing it with the Petitioner on multiple occasions, he felt the Petitioner understood that he could be convicted for merely driving through the drug-free zone with the cocaine. Counsel again indicated his personal disagreement with the prevailing application of the law. Counsel stated that he told the Petitioner that he would argue for an alternative interpretation of the statute, although counsel did not think "that was the status of the law." Counsel further noted that in his opinion, that the manner in which the jury instruction regarding the drug-free zone enhancement was written was at odds with case law on the topic.
Upon examination by the post-conviction court, trial counsel testified that he would have explained the concept of constructive possession to the Petitioner. Counsel noted, though, that he did not know whether he "went into a specific enough conversation where [the Petitioner] understood that" concept. Counsel also discussed with the Petitioner that his flight from police was damaging to his case.

The Petitioner testified that he was diagnosed with bipolar disorder in 2011 and had been prescribed lithium, klonopin, and Prozac. The Petitioner applied for and was granted social security disability benefits in spring 2011, two months after he applied. He stopped taking his medication around spring 2013 because he did not like taking medications. The Petitioner stated that trial counsel was aware of the Petitioner's receiving social security benefits as a result of his being disabled due to mental health issues. The Petitioner noted that he paid counsel on the third of each month because he received his social security check on the first of the month.

The Petitioner testified that although trial counsel gave him a list of the State's evidence before trial, he never received a copy of the discovery materials. The Petitioner had never seen the "Notice of the Impeaching Conviction" before the post-conviction hearing and was not aware he would be impeached if he testified. The Petitioner stated that he met with counsel in April, May, and at court in June and July. The Petitioner estimated that he spent one and one-half hours with counsel in total outside of court. Counsel and the Petitioner reviewed the recording of the preliminary hearing in May, but the recording was indecipherable. According to the Petitioner, they agreed that they needed a transcript of the hearing.

The Petitioner testified that the day before trial, trial counsel called him while the Petitioner was at work and asked whether he was going to proceed to trial. Counsel asked the Petitioner to "just come in like an hour before trial." Counsel was late for their meeting and arrived fifteen minutes prior to trial. The Petitioner stated that they were late for the trial and that when the trial court asked why they were late, counsel responded that "he was telling [the Petitioner] what happened and that's why [counsel's] closing arguments were wrong about it."

The Petitioner testified that trial counsel never consulted him regarding the issues in the motion for a new trial or on direct appeal. The Petitioner stated that he "begg[ed]" for the trial transcript and that counsel was recorded in prison telephone calls saying, "[D]on't worry about that, they don't have [any] evidence against you, they have to prove you were in a school zone selling drugs[.]"[8] The Petitioner eventually obtained the trial transcript from post-conviction counsel.

The Petitioner testified that trial counsel told him "over and over" that the State had to prove he was selling drugs in a school zone. The Petitioner thought that counsel was correct because at the motion for a new trial hearing, the trial court commented that it could not find any case similar to the Petitioner's and that "we were going to send it on to the appeal process." The Petitioner noted that ultimately, counsel's legal advice that the Petitioner had to be selling drugs in a school zone to be convicted was incorrect. The Petitioner stated that counsel also advised him on the morning of trial to plead guilty to the marijuana and traffic charges because it would make him "seem more believable to the jury." Counsel explained on the morning of trial that the Petitioner had to decide whether to testify and told him to think about it. When the trial court asked whether the Petitioner would testify, counsel said that he would. The Petitioner "felt obligated to testify once he said that in front of the jury." The Petitioner had not yet told counsel whether he wanted to testify. The Petitioner stated that in a prior telephone conversation, counsel told him his previous convictions were inadmissible because they were not drug related.

The Petitioner testified that on the night of the traffic stop, he gave consent for the officers to search his person, and nothing other than a receipt was found. He did not give consent for them to search his truck, although "they said [he] did." The Petitioner received a copy of Officer Lovett's police report before the direct appeal was filed. The Petitioner stated that the following discrepancies existed between the officers' testimony and the actual events: Officer Lovett testified that he never saw a Taser probe hit the Petitioner, but in the police report stated that "once he noticed that the ta[s]ing didn't phase [the Petitioner], then he pursued [him]"; both officers testified at the post-

---

[8] No such recordings were introduced at the post-conviction hearing.

conviction hearing that they chased the Petitioner, but Officer Lovett testified at trial that the reason he stopped chasing the Petitioner was because he was alone and felt unsafe; the Petitioner only saw one police vehicle with two occupants and not two vehicles; and Officer Lovett testified at the post-conviction hearing that his police cruiser was not equipped with a camera, but he testified at trial that his camera was not functioning.

The Petitioner summarized his version of events, which was mostly consistent with his trial testimony. The Petitioner stated that Deputy Parks asked him where "the guns" were and "never said anything to [the Petitioner] about drugs." The Petitioner also stated, though, that when Deputy Parks asked about guns, the Petitioner thought he was being "profiled" and that because the Petitioner had a prior robbery conviction, Deputy Parks was "thinking there[ were] drugs in [the Petitioner's] vehicle." The Petitioner said that when Deputy Parks explained that the police dog was going to be walked around his truck, he told them to "go ahead" because he had nothing to "worry about." The Petitioner noted that the marijuana cigarette in the ashtray did not contain any marijuana and that he had "bit[ten] the tip off of the cigar before [he] smoked it."

The Petitioner testified that the police dog "jumped up, sniffed through [his] vehicle" twice and did not signal, that the officer with the dog[9] put the dog back into his police cruiser, and that the Petitioner asked one of the officers if he was racist. The Petitioner asked Deputy Parks if he could receive his citation and leave; Officer Lovett put on gloves and opened the truck's door; and Officer Lovett told the Petitioner, "I wouldn't have [done] this to you if you wouldn't have asked me if I was racist[.]" The Petitioner noted that from his vantage point at the back of the truck, he could not see where Officer Lovett was searching. The Petitioner stated that Officer Lovett told him that the Petitioner's father "yelled at [the Petitioner] as a kid and [the Petitioner] just didn't ever tell the truth." The Petitioner's reaction was to "swing at" Officer Lovett, but he did not. The Petitioner saw a camera in Officer Lovett's police cruiser, decided "to fight this in court," and "took off running." The Petitioner stated that one of the officers fired a Taser and hit the Petitioner, but he pulled out the Taser probes before he was shocked. As he continued to run, the Petitioner asked himself why he was running. Deputy Parks grabbed the Petitioner's jacket, and the Petitioner slipped out of it. Ultimately, the Petitioner circled back to his car and saw it sitting in the street with the doors open. The officers were gone. The Petitioner decided not to retrieve his truck and instead went to a friend's house. His friend's mother declined to allow him to stay there, although she believed that he did not do anything wrong.

The Petitioner did not remember "an issue with an outstanding warrant that they were trying to check[.]" He noted that he did not see the officers "doing anything." The Petitioner estimated that the traffic stop lasted "ten, 15, 20 minutes or so." The Petitioner

---

[9] The Petitioner did not clearly identify the officers during this part of his testimony.

did not check his clock when he was stopped, and he noted that his cell phone was taken by the police after he left it in the truck. The Petitioner stated that his "felony evading charge" was dismissed after one of the officers testified at a preliminary hearing that the Petitioner was "free to leave the scene." The Petitioner said that he "asked [trial counsel] about sending the scales off" to be fingerprinted. When asked whether he requested "fingerprinting DNA analysis," the Petitioner stated, "I didn't know . . . . I thought that was just what the police did. I didn't know that I had to make a request to have it." When asked whether there were any witnesses the Petitioner wanted counsel to speak with during trial preparation, the Petitioner stated, "No, he didn't follow through [with] it." The Petitioner stated that he read in the trial transcript counsel's argument to the jury regarding constructive possession and that counsel "stated to the jury that you just having drugs around you is not enough to say that the drugs are yours. That's in [the] transcript and that's what [counsel] was originally telling [the Petitioner.]"

The Petitioner testified that trial counsel discussed filing a motion to suppress but ultimately did not do so based upon his legal research. The Petitioner never visited the scene of the stop with counsel and did not know if counsel visited it independently. The Petitioner stated that he started taking lithium when he went to jail and that "within the last couple of months" had stopped taking it without consulting his doctor. The Petitioner said that in his opinion, counsel's discussing the Petitioner's guilty pleas in front of the jury "plant[ed] in the jury's mind that [he] was guilty already[.]" The Petitioner stated that although he had "several issues" he wanted counsel to pursue before trial, he could not remember them. The Petitioner said that he attended two years of college.

The Petitioner testified that he did not understand Officer Lovett's "switching up his stories so many times" and that the inconsistencies "show[ed] that he [was] a liar and that he[ was] capable of lying." The Petitioner opined that trial counsel should have attacked the credibility of the police officers and that in the absence of another person claiming ownership of the drugs or an argument that the police "did anything," the jury would have "ha[d] to" conclude the drugs belonged to the Petitioner. The Petitioner stated that counsel should have spoken to the officers before trial "so he could have at least known what they were going to testify to" and see if anything could be done about the testimony. The Petitioner further stated that counsel made references to the Petitioner's smoking crack cocaine such that the Petitioner almost lied during his testimony when counsel asked if he used cocaine. The Petitioner hypothesized that if he had admitted to using cocaine, he would have been convicted of simple possession. Ultimately, the Petitioner decided to tell the truth at trial and denied using crack cocaine. The Petitioner stated that although he did not bear a grudge against counsel, he lost respect for counsel when counsel denied having told the Petitioner that he had to be selling drugs in a school zone in order to be convicted.

Post-conviction counsel argued in closing that the Petitioner's case was one of constructive possession, that no DNA or fingerprint testing tied the Petitioner to the cocaine, and that it would cost $600,000[10] for the Tennessee Department of Correction to house the Petitioner during his sentence. Counsel noted that the street value of the cocaine in this case was at most $600 and that the comparative cost to the State of housing the Petitioner was not a good use of State resources. Counsel argued that the application of the drug-free zone "enhancement" to an initial offense without "an application to only subsequent charges[,]" analogizing to domestic assault and driving under the influence sentencing enhancements, was unconstitutional. The post-conviction court noted that in its opinion, the drug-free zone statute was not "logical" because it did not enhance the punishment for selling drugs to children, but rather subjected defendants to a harsher penalty for driving through a one-thousand-foot radius from a school. The court further commented that the statute gave prosecutors "an unfair negotiating advantage in being able to almost pressure people" into accepting plea offers and that "once the Legislature put[] a drug crime on the book, it's not good politics to vote to take it off." The court noted that it and the jury were bound by the law "whether they like[d] it or not[.]" Post-conviction counsel also argued that the drug-free zone enhancement was contrary to the intent of the Tennessee Criminal Sentencing Reform Act of 1989 because the sentence was not "justly deserved" in relationship to the seriousness of the offense.

The post-conviction court stated that "about the only evidence that might make [trial counsel] ineffective would be if [the Petitioner] was true in saying that [counsel] told him the State could not convict him unless they proved they he was selling, or intending to sell drugs within a thousand feet of that school." The court noted that "the real credible evidence" was that counsel advised the Petitioner to accept the plea offer "because [counsel] knew that unless [the jury] believed a convicted thief, that he didn't know the drugs [were] in his truck, then the jury was going to find that his running [from police] . . . was going to make this a slam-dunk case for the State[.]" The court noted that counsel's "only chance of helping" the Petitioner was to either convince him to plead guilty or to convince the jury that the cocaine was for personal use. The court noted Lieutenant Doelle's testimony that no drug paraphernalia typical of a cocaine user was found in the truck. The court noted another case over which it presided in which a defendant "fell on some" cocaine during the execution of a search warrant and in which the court did not agree with the imposition of a fifteen-year minimum sentence but was bound to do so by law.

---

[10] The Petitioner's late-filed exhibit showed a cost of $77.82 per day to house a prisoner in fiscal year 2016-17. For a fifteen-year sentence, the total cost was slightly more than $426,000.

In a written order denying post-conviction relief, the post-conviction court found, as relevant to this appeal, that the Petitioner's allegation regarding the unconstitutionality of his conviction "alleg[ed] a legal conclusion, without any specific facts[.]" The court found that trial counsel was "well aware" of the evidence against the Petitioner and conducted an adequate pretrial investigation. The court noted that the Petitioner "failed to present any evidence that could have resulted from a more thorough investigation at the evidentiary hearing." See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Relative to the Petitioner's contention that counsel should have shown "an absence of prior drug charges," the court found that such evidence "could have backfired" on the Petitioner and that it would not question counsel's strategy. Relative to the Petitioner's argument that counsel did not spend enough time communicating with him before trial, the court found that "[t]here was no particular reason to spend a lot of time on trial preparation itself" and that counsel tried to persuade the Petitioner to avoid trial. The court further found that "[a]ny fault for failure to intelligently communicate [lay] with the Petitioner, not his counsel."

Relative to Officer Lovett's being qualified as an expert, the post-conviction court found that trial counsel's cross-examination revealed "some weaknesses" in the expert's opinion and that the jury was instructed regarding credibility determinations. The court found that the Petitioner's objections to portions of Officer Lovett's testimony went to the weight rather than the admissibility of such evidence. Relative to the inconsistencies in the officers' testimony, the court found that counsel cross-examined the officers about the inconsistencies. The court found relative to sentencing that counsel was not ineffective for failing to file a notice of mitigating factors and that the Petitioner received the minimum sentence available. Relative to the Petitioner's bipolar disorder, the court found that counsel was not aware of any mental health issues until he read the presentence report, that the Petitioner communicated well and had completed more than one year of college, and that the Petitioner "showed no evidence" of mental issues during trial or the post-conviction hearing. The court further found that no evidence suggested the Petitioner's rights were violated or that his diagnosis "had any impact upon the outcome of the trial."

The post-conviction court found that although trial counsel used an incorrect date when attempting to subpoena the police dispatch records, the Petitioner failed to show how the records would have led to a different outcome at trial, and the court found that no such records existed. The court found that the Petitioner did not prove prejudice resulted from counsel's failure to interview Deputy Parks and Officer Lovett, noting that counsel had access to the written police reports and the audio recording of the preliminary hearing.

Paragraph 44 of the amended post-conviction petition stated as follows:

-17-

Petitioner asserts that trial counsel rendered ineffective assistance of counsel by failing to have a thorough discussion with Petitioner regarding whether Petitioner should testify[,] violating Petitioner's 6th Amendment Rights. The decision to testify or to not testify is solely at the discretion of Petitioner, and this decision was based on an inadequate pretrial investigation, lack of meaningful consultation with Petitioner. and a failure to prepare thoroughly for trial, especially given the serious nature of the charges and the penalties they commanded if convicted.

The post-conviction court found relative to paragraph 44 that it "merely allege[d] a conclusion that [was] not supported by credible evidence." The court found that counsel "did a meaningful preparation" for trial, that "not much factual dispute" existed in the case, and that the failure of the defense theory to succeed did not entitle the Petitioner to relief.

Relative to the proportionality of the sentence and its being against the intent of the principles and purposes of sentencing, the court found that it agreed with the Petitioner, but "appellate courts have denied such relief, and this [c]ourt is without authority to grant the Petitioner any relief[.]"

Relative to trial counsel's failure to file a motion to suppress, the post-conviction court found that any motion to suppress did not have a reasonable chance of success, that counsel was familiar with the relevant case law, and that according to the officers' testimony, the police dog sniff search did not prolong the stop. Relative to trial counsel's failure to request DNA or fingerprint testing, the court found that although such evidence could have weighed in favor of the Petitioner, his flight from police was "strong circumstantial evidence of guilty knowledge and might have resulted in his conviction" even if the Petitioner's DNA and fingerprints were not present on the drugs or scales. The court found that the Petitioner's allegation that counsel fell below professional standards in investigating and evaluating the case was a "mere conclusion not supported by the evidence." The court concluded that the Petitioner had not shown that counsel rendered ineffective assistance. The court noted that it did not "like" the result of the case and found that the result was not counsel's fault. The court found that counsel "went above and beyond the call of duty in trying to get [the Petitioner] to understand the substantial risk of his unwillingness to assume any responsibility for those drugs found in his truck after he fled the scene on foot." The court articulated its belief that the Petitioner's only avenue for relief was through a commutation of his sentence "to something more appropriate for the crime." This timely appeal followed.

ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The Petitioner raises two constitutional claims, ineffective assistance of counsel and disproportionate sentencing. Relative to ineffective assistance, we have reorganized the issues raised in the appellate brief for clarity as follows: (1) trial counsel's investigation and preparation for trial; (2) counsel's presentation of the defense at trial; (3) counsel's communication with the Petitioner in advance of trial, including their discussion of the Petitioner's right to testify; and (4) cumulative error.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id.

## A. Ineffective Assistance of Counsel

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id. We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

1. Investigation

The Petitioner contends that trial counsel provided ineffective assistance in his investigation of the case, arguing that counsel failed to investigate "a number of pieces of evidence," including visiting the site of the traffic stop, requesting DNA and fingerprint testing, obtaining a witness list, and requesting a mental evaluation in light of the Petitioner's bipolar disorder diagnosis. The Petitioner also argues that counsel did not "check and review known facts," discover that the Petitioner was receiving Social Security benefits, interview the State's witnesses, or provide the discovery materials or a copy of the preliminary hearing transcript to the Petitioner. He further notes counsel's using the wrong year in attempting to subpoena the police dispatch records.[11] The State responds that counsel was not deficient in his investigation of the Petitioner's case and that the Petitioner was not prejudiced by any alleged deficiencies.

---

[11] At oral argument, post-conviction counsel raised trial counsel's issuing a subpoena to Maury County rather than Spring Hill; however, this issue was not raised in the appellate brief. In any event, trial counsel testified that he issued subpoenas to both agencies.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

Relative to visiting the scene of the traffic stop, trial counsel testified that in addition to being familiar with the area, he drove through the location of the stop and the route the Petitioner ran from police. The Petitioner does not explain what more counsel should have done to yield different information or what that information might have been. The Petitioner impliedly raises counsel's failure to measure the distance between the traffic stop and the elementary school, but he does not argue that Lieutenant Doelle's measurements were inaccurate or provide contradictory measurements. The Petitioner has not established that counsel was deficient or that he was prejudiced in this regard.

In addition, the Petitioner does not explain why obtaining a written witness list was necessary in light of counsel's verbal discussion of the four anticipated witnesses with the prosecutor. We note that no unanticipated witnesses testified at trial. Likewise, the Petitioner does not argue how any delay in his obtaining a copy of the discovery file, as opposed to a list of the State's evidence, resulted in prejudice to his case. Further, the

Petitioner's statement that his having the preliminary hearing transcript would have "help[ed] illustrate discrepancies in the officer[s'] stories . . . and the differences between the [p]reliminary [h]earing and trial" does not allege how this would have led to a different outcome at trial. Counsel cross-examined the officers at trial, and the jury had the opportunity to assess their credibility.

Relative to DNA or fingerprint testing, there was a valid tactical reason not to order testing—the results could have possibly inculpated the Petitioner and strengthened the State's case, and it did not change the fact that the Petitioner fled from police. We note that the Petitioner did not present the results of any such testing at the post-conviction hearing. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Relative to interviewing the State's witnesses, counsel testified that he did not interview Officer Lovett and Deputy Parks because he had their written police reports and preliminary hearing testimony and already knew the substance of their proposed trial testimony. We note that the Petitioner's assertion that counsel did not interview any of the State's witnesses is incorrect—counsel testified that he interviewed Lieutenant Doelle before trial.

Moreover, as the post-conviction court observed, the Petitioner has not presented what evidence counsel would have discovered if he had conducted a more thorough investigation. If a post-conviction petitioner argues that evidence should have been presented at trial, the evidence must be presented at the post-conviction hearing. See Black, 794 S.W.2d at 757. Similarly, relative to the typographical error in the police dispatch record subpoena, the Petitioner did not admit into evidence any police dispatch records that would have been obtained if counsel had used the correct date. See id. We cannot speculate as to the contents of records that may not exist.

We note that the Petitioner argues for the first time on appeal that presenting evidence of his bipolar disorder diagnosis and failure to take his medication would have explained to the jury the "bizarre" behavior he exhibited at the traffic stop, including accusing the police of racism and fleeing from them. This argument was not made at the post-conviction hearing, and the post-conviction court did not address any such argument in its order. The Petitioner may not assert new arguments for the first time on appeal.

The Petitioner's argument in his post-conviction petition and at the hearing dealt with counsel's alleged failure to file a motion for a mental evaluation in the context of the Petitioner's competency and his failure to discover that the Petitioner was receiving Social Security benefits. Although the Petitioner testified that he had a bipolar disorder diagnosis, as corroborated by his self-reported diagnosis in the presentence report, he did not exhibit any unusual behaviors or an inability to communicate with counsel such that counsel should have been alerted to a possible mental health issue. The Petitioner was

able to discuss his case with counsel over the telephone and by letter, and counsel was unaware of the Petitioner's diagnosis until he read the presentence report. We note that the Petitioner did not "present the testimony of an expert at the evidentiary hearing to explain what, if any, mental health evidence trial counsel should have advanced" to establish his being incompetent to stand trial. Demario Johnson v. State, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *8 (Tenn. Crim. App. Feb. 27, 2013); see Black, 794 S.W.2d at 757.

Relative to the Petitioner's receiving Social Security disability benefits, we note that the Petitioner testified about his working at trial and the post-conviction hearing; counsel also testified that the Petitioner discussed his work, and the presentence report reflects the Petitioner's reporting having worked multiple jobs during the period after which he was declared disabled. Although under some circumstances recipients of Social Security Disability benefits may work a very limited amount, generally speaking, presenting evidence of the Petitioner's receiving federal disability benefits while continuing to work could have damaged his credibility with the jury. The Petitioner is not entitled to relief on this basis.

2. Defense Pretrial and at Trial

The Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress, call character witnesses, object to Officer Lovett's qualifications as an expert, and file and argue mitigating factors in sentencing. The Petitioner also argues that counsel was ineffective for encouraging him to plead guilty to the traffic and marijuana offenses. The State responds that counsel was not ineffective.

Trial counsel testified that no basis for a motion to suppress existed based upon his understanding of the law. He correctly noted that if the police dog sniff search failed to unnecessarily prolong the search, the search was not unconstitutional. The officers' testimony did not indicate any delay in the traffic stop, and Officer Lovett stated that he was waiting for Spring Hill dispatch to call him back with the Petitioner's information when the sniff search occurred. Counsel was not deficient for failing to file a futile motion.

The Petitioner did not present any proposed character witnesses at the post-conviction hearing; his argument is without merit in this regard. See Black, 794 S.W.2d at 757. Relative to Officer Lovett, trial counsel testified that he determined that the trial court was going to qualify Officer Lovett as an expert and decided not to object. We agree with the post-conviction court that any confusion in Officer Lovett's testimony served to discredit him in front of the jury and that the decision not to object was tactical. Counsel was not deficient in this regard.

Relative to mitigating factors in sentencing, the Petitioner does not specify which mitigating factors should have applied. We note that the presentence report listed no applicable mitigating or enhancement factors. In any event, no prejudice resulted from failing to argue mitigating factors because the Petitioner received the minimum available sentence. Finally, counsel was not deficient for advising the Petitioner to plead guilty to the marijuana and traffic offenses. Counsel attempted to build the Petitioner's credibility by demonstrating that he would accept responsibility for actions he had committed, implying that his refusal to plead guilty to the cocaine charge was based upon his innocence. Although this strategy did not ultimately have the desired effect, the fact that a trial strategy was unsuccessful does not mean counsel was deficient for attempting it. We will not deem counsel to have been ineffective merely because a different strategy might have produced a more favorable result. See Rhoden, 816 S.W.2d at 60.

3.  Communication with the Petitioner

The Petitioner contends that trial counsel rendered ineffective assistance by failing to meet with the Petitioner in person before the day of trial, when they met for only thirty minutes, and by stating in open court that the Petitioner would testify before the Petitioner had made his decision. The State acknowledges that the post-conviction court made no findings regarding the Petitioner's decision to testify but argues that the record contains sufficient testimony and related findings from the post-conviction court for this court to review the issue without remanding for specific factual findings.

The post-conviction court's order does not address the right-to-testify issue; although the court did not make a specific finding that the Petitioner was not credible, it noted in regard to paragraph 44 that the allegations were "not supported by the credible evidence." The testimony at the post-conviction hearing regarding the Petitioner's decision to testify is limited to the Petitioner's version of events, in which he claimed trial counsel explained the Petitioner's right to testify and the Petitioner was still considering his options when counsel announced in open court that the Petitioner would testify. The trial transcript reflects that counsel affirmed that the Petitioner would testify on three occasions, the first of which was during opening arguments. Counsel discussed the Petitioner's anticipated testimony and, in response to a question from the trial court, stated that the Petitioner would testify.

Trial counsel testified at the post-conviction hearing that he and the Petitioner discussed the Petitioner's right to testify, although counsel did not remember exactly when the discussion occurred, and that counsel recalled the trial court "went over Momon." Counsel told the Petitioner that counsel needed to put him on as a witness so that the Petitioner could tell the jury the drugs were not his and explain why he ran from

the police. Counsel noted that the Petitioner could not identify the owner of the cocaine and that counsel wanted to "humanize" the Petitioner for the jury. Counsel felt that the "only way to counter" the State's theory of guilt based upon the Petitioner's flight from police was to have the Petitioner testify. The post-conviction court found generally that counsel was well-prepared in his representation of the Petition in this case and adequately communicated with the Petitioner. Moreover, the court implicitly discredited the Petitioner's testimony when it found that the allegations in paragraph 44 were not supported by credible evidence. The Petitioner has not proven by clear and convincing evidence that counsel was deficient.

We note that trial counsel's assertion during his testimony that the trial court "went over Momon" is not reflected in the trial transcript. The record reflects that at the end of the first day of trial, the jury was excused, and court asked for a second time whether the Petitioner was going to testify. Counsel responded affirmatively, and a jury-out hearing was held regarding references to the Petitioner's previous convictions. The next day, after the motion for a judgment of acquittal and some discussion of the jury instructions, the following exchange occurred:

THE COURT: The defendant is testifying, so we don't need a [M]omon hearing, right?
[TRIAL COUNSEL]: If you're going to – I know you do if he doesn't. Whether he has to if he does, I don't know the answer to that question. I don't think you do.
THE COURT: Well, it's not a [M]omon issue. It may be a right-to-silence issue.
[TRIAL COUNSEL]: Right.
THE COURT: But I don't do it.

Nevertheless, the Petitioner did not testify at the post-conviction hearing that he would not have testified if he had been given more time. The Petitioner also fails to allege that he would have been acquitted if he had not testified. The record is sufficient for us to conclude that the Petitioner has not proven that he was prejudiced by any alleged deficiency in counsel's discussion with the Petitioner of his testifying. The Petitioner is not entitled to relief on this basis.

B. *Proportionality of Sentence*

The Petitioner contends that the fifteen-year minimum sentence mandated by Tennessee Code Annotated section 39-17-432(b) is disproportionate, citing the cost of housing the Petitioner as an inmate, the comparative sentences for more serious offenses like violent crimes, the sentencing practices for the same offense at the federal level and in other states, and the post-conviction court's disagreement with the sentencing law.

-25-

The State responds that the Petitioner has waived this issue because he did not raise it at sentencing or in his direct appeal. See Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]").

We agree that this claim should have been raised in prior proceedings and, as such, it has been waived. See, e.g., Cribbs, 2009 WL 1905454, at *54-55 (waiving consideration of the constitutionality of the death penalty in a post-conviction appeal for failure to raise the claim in previous proceedings). Although the Petitioner challenged the application of the drug-free zone enhancement to his case, he did not challenge the constitutionality of his sentence.

Because the Petitioner does not also raise this issue in the context of ineffective assistance of counsel, we will not consider the merits of the claim other than to note that the constitutionality of the drug-free zone enhancement relative to the Eighth Amendment has been upheld by this court[12] and that, even if properly preserved, the Petitioner's contention that "i[t] is time to reform the Drug Free Zone laws" is not appropriately presented here. It is not the province of this court to, as post-conviction counsel stated at oral argument, "make a decision to change the law and override the legislature's statute."

We also note that the Petitioner's argument regarding the drug-free zone enhancement's being inconsistent with the Sentencing Reform Act of 1989 is not an appropriate issue for post-conviction relief. See Hickman v. State, 153 S.W.3d 16, 19-20 (Tenn. 2004) (articulating the difference between petitions for habeas corpus, which may attack void sentences imposed in contravention of statute, and post-conviction petitions, which attack sentences that are void or voidable "because of the abridgement of constitutional rights"); see also Tenn. Code Ann. § 40-30-103. The Petitioner is not entitled to relief on this basis.

## C. Cumulative Deficiency/Error

The Petitioner contends that the cumulative effect of trial counsel's alleged deficiencies and the disproportionality of his sentence deprived him of a fair trial. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so

---

[12] See State v. Smith, 48 S.W.3d 159, 170 (Tenn. Crim. App. 2000); State v. Jenkins, 15 S.W.3d 914, 919 (Tenn. Crim. App. 1999).

great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). In this case, we have concluded that counsel was not deficient in any respect. Therefore, cumulative error analysis does not apply. The Petitioner is not entitled to relief on this basis.

<u>CONCLUSION</u>

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE